# 14-2241-CV

## United States Court of Appeals

*for the*

## Second Circuit

ELITE AVIATION LLC, ENDLESS H3,

*Plaintiffs-Appellants*,

DAVID SCHOTTENSTEIN, Individually
and on behalf of all others similarly situated,

*Plaintiff*,

WILLIAM BOSTEDO, Individually and on Behalf of All others Similarly
Situated, GRACE TRADING, LLC, ANN NICOLOSI, Individually
and on behalf of all others similarly situated,

*Consolidated-Plaintiffs*,

v.

CREDIT SUISSE AG, RENATO FASSBIND, CREDIT SUISSE SECURITIES
(USA) LLC, PAUL J. O'KEEFE, HANS-ULRICH DOERIG, BRADY W.
DOUGAN, D. NEIL RADEY, WALTER B. KIELHOLZ, PETER BRABECK-
LETMATHE, THOMAS W. BECHTLER, ROBERT H. BENMOSCHE,

*(For Continuation of Caption See Inside Cover)*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLP
*Attorneys for Plaintiffs-Appellants*
270 Madison Avenue
New York, New York 10016
(212) 545-4600

---

NOREEN DOYLE, JEAN LANIER, ANTON VAN ROSSUM, AZIZ R.D. SYRIANI, DAVID W. SYZ, ERNST TANNER, RICHARD E. THORNBURGH, PETER F. WEIBEL,

*Defendants-Appellees*,

NICHOLAS CHERNEY, VELOCITYSHARES LLC, RICHARD HOGE, VLS SECURITIES LLC,

*Consolidated-Defendants-Appellees*.

---

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Fed. R. App. P. 26.1, the undersigned counsel of record for Plaintiffs-Appellants affirms that no publicly held parent corporation owns ten percent or more of Plaintiffs-Appellants' stock.


Dated: August 12, 2014                  Respectfully submitted,

<u>/s/ Mark C. Rifkin</u>
Mark C. Rifkin, Esq.
rifkin@whafh.com
Matthew M. Guiney, Esq.
guiney@whafh.com
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600

***Plaintiffs' Lead Counsel***

# <u>TABLE OF CONTENTS</u>

<u>Page(s)</u>

Table of Authorities ……………………………………………………..…iii

I.      JURISDICTION ...................................................................................1

II.     ISSUES PRESENTED FOR REVIEW ...............................................1

III.    STATEMENT OF THE CASE.............................................................1

IV.     STATEMENT OF THE FACTS ..........................................................4

        A.    TVIX ETNs ................................................................................8

        B.    Events Leading To The Complaint ........................................10

        C.    The Complaint .........................................................................11

V.      SUMMARY OF THE ARGUMENT ..................................................17

VI.     ARGUMENT.......................................................................................19

        A.    Standard of Review ................................................................19

        B.    Motions To Dismiss Section 11 Claims ................................19

        C.    The Complaint Sufficiently Alleges That The Offering
              Documents Did Not Disclose The Risk Of Holding TVIX
              ETNs For More Than One Trading Session......................................21

        D.    The Offering Documents Did Not Disclose The Magnitude
              Of The Risk of Holding TVIX ETNs For Longer Than
              One Trading Session................................................................31

        E.    The District Court's Conclusion That The Offering
              Documents Could Not Mislead Investors Is Belied By
              Regulatory Action And The Undisputed Facts ....................38

        F.    The Complaint Does Not Allege Any Failure to Predict
              The Future Or To Disclose Publicly Available Information..............39

i

G.    The District Court Improperly Decided That The Alleged
      Misrepresentations And Omissions Were Immaterial As
      A Matter Of Law .................................................................42

H.    The Dislocation Period Allegations Are Sufficient..........................46

VII.   CONCLUSION ...............................................................52

# TABLE OF AUTHORITIES

**CASES**                                                     **Page(s)**

*In re American International Group, Inc.,*
741 F. Supp. 2d 511 (S.D.N.Y. 2010) ................................................................37

*In re AMF Bowling Securities Litigation,*
99 Civ. 3023 (DC),
2001 U.S. Dist. LEXIS 3182 (S.D.N.Y. Mar. 22, 2001).......................................45

*In re Bear Stearns Cos., Inc. Securities, Derivative, and ERISA Litigation,*
763 F. Supp. 2d 423 (S.D.N.Y. 2011) ................................................................36

*Castellano v. Young & Rubicam, Inc.,*
257 F.3d 171 (2d Cir. 2001).................................................................................50

*In re Citigroup Bond Litigation,*
723 F. Supp. 2d 568 (S.D.N.Y. 2010) ................................................................31

*In re DDAVP Indirect Purchaser Antitrust Litigation,*
No. 05-CV-2237 (CS),
2012 U.S. Dist. LEXIS 149588 (S.D.N.Y. Oct. 16, 2012)...................................41

*DeMaria v. Andersen,*
318 F.3d 170 (2d Cir. 2003)...............................................................................21

*In re Direxion Shares ETF Trust,*
279 F.R.D. 221 (S.D.N.Y. 2012) .................................................................*passim*

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,*
553 F.3d 187 (2d Cir. 2009)...........................................................................21, 43

*Freidus v. ING Groep N.V.,*
736 F. Supp. 2d 816 (S.D.N.Y. 2010) ................................................................31

*Hunt v. Alliance North America Government Income Trust, Inc.,*
159 F.3d 723 (2d Cir. 1998).................................................................................37

*Litwin v. Blackstone Group, L.P.,*
  634 F.3d 706 (2d Cir. 2011),
  *cert. denied,* 132 S. Ct. 242 (2011) ................................................................19, 21

*In re Merrill Lynch & Co. Research Reports Securities Litigation,*
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...............................................................41

*In re Morgan Stanley Information Fund Securities Litigation,*
  592 F.3d 347 (2d Cir. 2010)..................................................................*passim*

*New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.,*
  08-5653 (PAC),
  2010 U.S. Dist. LEXIS 47512 (S.D.N.Y. Mar. 29, 2010) ..................................37

*Panther Partners , Inc. v. Ikanos Communications, Inc.,*
  538 F. Supp. 2d 662 (S.D.N.Y. 2008) ............................................................50, 52

*In re ProShares Trust Securities Litigation,*
  889 F. Supp. 2d 644 (S.D.N.Y. 2012) ........................................................*passim*

*In re ProShares Trust Securities Litigation,*
  728 F.3d 96 (2d Cir. 2013)......................................................................25, 26, 28

*Rafton v. Rydex Series Funds,*
  10-CV-01171-LHK,
  2011 U.S. Dist. LEXIS 707 (N.D. Cal. Jan. 5, 2011) ...................................34, 35

*Rombach v. Chang,*
  355 F.3d 164 (2d Cir. 2004)...........................................................................20

*SEC v. First Jersey Securities, Inc.,*
  101 F.3d 1450 (2d Cir. 1996)...........................................................................21

*In re TVIX Securities Litigation,*
  No. 12 Civ. 4191 (LTS),
  2014 U.S. Dist. LEXIS 78298 (S.D.N.Y. June 9, 2014) .......................................3

*United States v. Gaudin,*
  515 U.S. 506 (1995)......................................................................................21

## <u>STATUTES & RULES</u>

15 U.S.C. § 77k(a) ...................................................................20

15 U.S.C. § 77l(a)(2) ...............................................................20

28 U.S.C. § 1291 .......................................................................1

28 U.S.C. § 1331 .......................................................................1

Federal Rules of Civil Procedure
  8(a)(2) ...................................................................................20
  9(b) .......................................................................................20
  12(b)(6) ................................................................................19

Investment Company Act of 1940 ...................................28, 29

Securities Act of 1933
  § 11, 15 U.S.C. § 77k ......................................................19, 21
  § 15, 15 U.S.C. § 77o ...........................................................21
  § 22, 15 U.S.C. § 77v .............................................................1

## I.    JURISDICTION

The district court had original subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act of 1933, 15 U.S.C. § 77v.  This Court has jurisdiction pursuant to 28 U.S.C. § 1291 to hear this appeal from the final decision of the district court that disposed of all parties' claims.

On June 9, 2014, the district court issued a memorandum order granting defendants' motion to dismiss the complaint.  Special Appendix ("SPA") 1-24. Judgment was entered on June 10, 2014.  (SPA-25).  On June 24, 2014, plaintiffs timely filed a Notice of Appeal to this Court.  Joint Appendix ("A") 301.

## II.    ISSUES PRESENTED FOR REVIEW

1.    Did the plaintiffs adequately allege that the registration statements for TVIX ETNs misrepresented material facts or omitted material facts necessary to make other statements therein not false or misleading?

2.    Did the plaintiffs adequately allege that the registration statements for TVIX ETNs misled reasonable investors about the nature and magnitude of the risk of purchasing and holding the securities for longer than one trading session?

## III.    STATEMENT OF THE CASE

Plaintiffs purchased VelocityShares Daily 2x VIX Short Term Exchange Traded Notes ("TVIX ETNs"), derivative securities whose performance was linked to the S&P 500 VIX Short-Term Futures Index (the "Index"), pursuant or traceable

to a Registration Statement and Prospectus dated March 25, 2009 (the "Registration Statement") (A-190-277) and a series of pricing supplements (the "Pricing Supplements" (A-120-189) and, together with the Registration Statement, the "Offering Documents").[1]

Between November 30, 2010 and October 9, 2012 (the "Class Period"), Credit Suisse AG and its affiliate Credit Suisse Securities (USA) LLC (together with the individual defendants, "Defendants") sold TVIX ETNs to plaintiffs and other purchasers pursuant to the Offering Documents.[2]

The complaint alleges that throughout the Class Period, the Offering Documents misstated and omitted material facts and information concerning substantial risks associated with purchasing and holding TVIX ETNs for longer

---

[1] During the Class Period, the original November 29, 2010 Pricing Supplement was amended, restated and superseded by Pricing Supplement No. VLS ETN-1/A dated December 8, 2010, Pricing Supplement No. VLS ETN-1/A2 dated March 30, 2011, Pricing Supplement No. VLS ETN-1/A3 dated April 8, 2011, Pricing Supplement No. VLS ETN-1/A4 dated May 31, 2011, Pricing Supplement No. VLS ETN-1/A5 dated June 27, 2011, Pricing Supplement No. VLS ETN-1/A6 dated July 1, 2011, Pricing Supplement No. VLS ETN-1/A7 dated August 10, 2011, Pricing Supplement No. VLS ETN-1/A8 dated January 19, 2012, Pricing Supplement No. VLS ETN-1/A9 dated January 27, 2012, Pricing Supplement No. VLS ETN-1/A10 dated February 2, 2012, Pricing Supplement No. VLS ETN-1/A11 dated February 3, 2012 and Pricing Supplement No. VLS ETN-1/A12 dated February 16, 2012.

[2] The individual defendants are Brady W. Dougan, Renato Fassbind, D. Neil Radey, Walter B. Kielhoz, Hans-Ulrich Doerig, Peter Brabeck-Letmathe, Thomas W. Bechtler, Robert H. Benmosche, Noreen Doyle, Jean Lanier, Anton Van Rossum, Aziz R.D. Syriani, David W. Syz, Ernst Tanner, Richard E. Thornburgh and Peter F. Weibel.

2

than one trading session, as well as the magnitude of that risk.  In particular, the complaint alleges that TVIX ETNs ***could not*** produce the returns illustrated in the Offering Documents and ***were not*** appropriate for the holding periods illustrated in the Offering Documents.  Indeed, the complaint alleges that, unlike traditional notes which are expected to be redeemed at par (or 100% of their face value) upon maturity, TVIX ETNs: (i) were designed to – and did – become virtually worthless within just two years after issuance; and (ii) never would been redeemed.  If the Offering Documents had disclosed these facts, the plaintiffs would have understood the significant risks associated with TVIX ETNs.  The Offering Documents, however, consistently misstated or omitted this material information.  When these misstated or undisclosed substantial risks actually materialized, Class members suffered a significant decline in value of their investment in the TVIX ETNs.  In fact, TVIX ETNs lost virtually ***all*** of their value just two years after issuance despite the Offering Documents' repeated references to payments at maturity and full-page charts illustrating potentially lucrative returns at the end of a 20 year holding period.

Court appointed lead plaintiffs filed a Consolidated Amended Complaint (A-64-119) on October 9, 2012, which the district court dismissed with prejudice on June 9, 2014, *In re TVIX Securities Litig.*, No. 12 Civ. 4191 (LTS), 2014 U.S. Dist. LEXIS 78298 (S.D.N.Y. June 9, 2014) (SPA 1-24).  Judgment was entered on June

10, 2014. (SPA-25). Plaintiffs timely appealed from the dismissal and judgment on June 24, 2014. (A-301).

## IV. STATEMENT OF THE FACTS

Despite their name, TVIX ETNs are not notes at all. They did not promise or obligate the defendants to make any payment of interest over any holding period or to repay any portion of their principal upon maturity.[3] Rather, TVIX ETNs are derivative securities intended as a high-frequency, short-term trading vehicle engineered to achieve their objective of two times the change in the Index on a daily basis. Importantly, TVIX ETNs are not intended to be held for periods longer than one trading session. In fact, by design, the value of TVIX ETNs decayed by a small amount every day as the securities were rebalanced to achieve the targeted "2x" daily exposure to the Index. As a result of that deliberate, cumulative daily decay, TVIX ETNs had an intended "shelf-life" of approximately two years, after which they would (and, in fact, did) become practically worthless.[4] Plaintiffs allege that the Offering Documents were materially misleading because

---

[3] *Barron's Dictionary of Finance and Investment Terms* defines as "note" as "a written promise to pay a specified amount to a certain entity on demand or on a specified date."

[4] On December 17, 2012, Credit Suisse announced a 1-for-10 reverse split for the notes, effective December 21, 2012. After the 1-for-10 reverse split, TVIX ETNs traded at approximately $6.85 per note. On a pre-split basis, the notes would have been trading for $0.685 per note, or just 0.0685% of their face value when first issued two years earlier.

they failed to inform investors of the nature and magnitude of the risk of holding TVIX ETNs for longer than one day, and that they suffered substantial losses on their investments when the undisclosed risk materialized.

The district court's memorandum opinion ignores the misleading way TVIX ETNs were described and illustrated in the Offering Documents and instead relies *solely* on boiler-plate "warnings" in the Offering Documents that they were *daily* investments. In doing so, the district court ignored the many contra-indicators and other material misrepresentations in the Offering Documents that the notes were appropriate for longer – in some cases, considerably longer – holding periods. For example, the Offering Documents: (i) included statements about repayment at maturity in the year 2030 even though no such repayment ever would be made; (ii) illustrated lucrative returns during the intervening 20-year period even though no such returns ever could be achieved; and (iii) discussed directional changes of returns "during the holder's holding period" which falsely implied holding periods longer (or much longer) than one day. When read as a whole, as they must be, the Offering Documents do not adequately warn investors that TVIX ETNs should not be held for longer than one trading session, nor do they disclose the magnitude of the risk of holding them for longer periods, including the certain and mathematically quantifiable negative effect of rebalancing on TVIX ETNs when held for more than a single day.

5

Because of the way TVIX ETNs were constructed, it was ***impossible*** for investors to avoid the risks associated with holding them for more than a day. As set forth in the Offering Documents, the defendants expected that TVIX ETNs would be bought and sold "primarily in the secondary market." (A-130). Every TVIX ETN sold on the secondary market remained outstanding overnight and, like a proverbial "hot potato," it had to be owned by someone, who was thus exposed to daily rebalancing costs. Even those few TVIX ETNs that were redeemed early could not avoid exposure to rebalancing costs: TVIX ETNs that were redeemed ***before*** 4:00 p.m. each day were priced at the ***following*** business day's Closing Indicative Value, exposing them to rebalancing costs for that day, and those that were redeemed ***after*** 4:00 p.m. were priced at the Closing Indicative Value on the ***second*** business day after redemption, exposing them to rebalancing costs for two days. (A-129). In addition, ***all*** TVIX ETNs that were redeemed were assessed an Early Redemption Charge of 0.05% of the applicable Closing Indicative Value. (A-130).

In addition, on February 21, 2012, Credit Suisse issued a press release and abruptly announced a temporary suspension of new issuances of TVIX ETNs and, on March 22, 2012, it abruptly announced the resumption of new issuances. During the suspension period (the "Dislocation Period"), TVIX ETNs traded in the secondary market at a significant premium over their indicative value (a theoretical

6

price based on the Index price); their market price dropped back to the Indicative Value when Credit Suisse began re-issuing TVIX ETNs.[5]

The district court also ignored the Company's March 22, 2012, press release – an announcement that precipitated what *Barron's* termed a "face ripping" two-day loss of 50% of TVIX ETNs' market price (A-104) – and erroneously concluded that any disclosures made that day already had been fully disclosed to investors by February 2012 at the beginning of the Dislocation Period. In fact, Class members did not understand the additional risk of loss caused by holding TVIX ETNs during the Dislocation Class Period. The press release and Offering Documents failed to disclose that the defendants' decision to suspend the issuance of new TVIX ETNs would cause the outstanding securities to trade at a large premium to their Indicative Value – approaching nearly 90% within just one month – because of a purported lack of borrowable shares created by Credit Suisse's own decision not to create new ones rather than any imbalance in supply and demand in the secondary market.

None of these risks or their magnitude was adequately explained in the Offering Documents. For all the reasons explained more fully below, the District Court's opinion should be reversed and the case should be remanded for further consideration.

---

[5] The "Dislocation Period" is February 22, 2012 through March 22, 2012.

### A.     TVIX ETNs

TVIX ETNs are putative unsecured obligations of the issuer, Credit Suisse, to make certain payments to holders upon maturity.  TVIX ETNs trade on the NYSE Arca in an active secondary market at a price based on their so-called "Indicative Value."  The Offering Documents describe TVIX ETNs as "short term notes" maturing on December 4, 2030, and state that for "each ETN, investors **will receive** a cash payment at maturity, upon early redemption or upon acceleration by us that will be linked to the performance of the applicable underlying Index, plus a Daily Accrual and less a Daily Investor Fee."  (A-120, 131) (emphasis added).

Prior to maturity and subject to certain other restrictions, investors may, until November 28, 2030, offer TVIX ETNs for redemption in whole lots of 25,000 securities each.  If an investor offers 25,000 TVIX ETNs for redemption and all the other requirements for redemption are met, the investor "will receive a cash payment per ETN on the Early Redemption Date equal to the Early Redemption Amount."  (A-81, 123).   The Early Redemption Amount is the Closing Indicative Value on the date of redemption minus the Early Redemption Charge, but no less than zero.  (A-120, 130).

However, TVIX ETNs are not notes.  Unlike traditional notes, TVIX ETNs do not include any promise to pay the face amount to holders at maturity; instead, the maturity payment, if any, is based upon the performance of the Index (minus

specified fees).  Unlike traditional notes, TVIX ETNs do not earn or pay any interest to investors.  And unlike exchange traded funds ("ETFs"), TVIX ETNs are not backed by any assets and do not seek to replicate or approximate the performance of the Index.  TVIX ETNs do offer leveraged exposure equal to two times (or "2x") the daily performance of the Index.   However, TVIX ETNs must be rebalanced every day to achieve their daily investment objectives, meaning the underlying investments are different every day.  (A-80).  Over time, the cost of rebalancing swamped the effect of any potential change in the Index, making it virtually certain that TVIX ETNs would become worthless in just two years if not sooner.

The stated, nominal amount of each TVIX ETN was $100.   (A-81).  However, TVIX ETNs were not an unconditional promise to pay $100 or any other sum certain at maturity.  Indeed, because TVIX ETNs were structured such that they would (and did) lose virtually all of their value in just two years as a result of the built-in cumulative daily decay, Credit Suisse never will pay anything to investors when the securities mature.  Instead, TVIX ETNs were useful (if at all) only as one-day trading vehicles.

**B.    Events Leading To The Complaint**

Early 2012 was an especially volatile time in the financial markets: Italian debt refinancing, potential changes to the Euro zone treaty, and questions surrounding looming Greek debt repayment deadlines combined to create the high-volatility environment.  That led many investors to seek exposure to the Index, which measures the implied volatility of the S&P 500 index options.  As a result, trading in TVIX ETNs surged rapidly, from an average of 6.67 million shares a day in January 2012 to 22 million shares a day in February 2012.  The assets under management also grew dramatically: at the end of January 2012, TVIX had $413 million in assets, but only two weeks later, its assets had jumped by more than 50%, or $279 million, to a total of $691 million. (A-81).

On February 21, 2012, Credit Suisse abruptly announced that it temporarily suspended issuance of new TVIX ETNs because it had reached purported "internal limits" on the amount it could issue.  The press release disclosed only these bare facts: "Credit Suisse announced today that it has temporarily suspended further issuances of the VelocityShares Daily 2x VIX Short-Term ETNs (Ticker Symbol: "TVIX") due to internal limits on the size of the ETNs." (A-82).

During the period of suspension, shares of TVIX ETNs traded at market prices significantly above the Index.  In fact, by March 21, 2012, TVIX ETNs traded at a market price almost twice as high as their Closing Indicative Value

10

("CIV").  After the close of trading on March 22, 2012, Credit Suisse announced it would resume issuing new TVIX ETNs on a limited basis beginning on March 23, 2012.  As a result of the announcement, the market price of TVIX ETNs dropped precipitously and returned to approximately the CIV during the trading day on March 23, 2012.

In response to suspicious trading activity on March 22, 2012, several securities regulators commenced investigations, including the Massachusetts Attorney General.  One commentator described the event as a "flash crash" and described TVIX ETNs as a "sick product."  (A-103, 105-107).  These events prompted the Financial Industry Regulatory Authority ("FINRA") to issue an Investor Alert on July 10, 2012, entitled "Exchange-Traded Notes—Avoid Unpleasant Surprises," which discussed the unique features and risks of exchange-traded notes.

### C.    The Complaint

The complaint alleges that during the Class Period the Offering Documents contained untrue statements of material fact concerning the risk of owning and holding TVIX ETNs and omitted to state other material facts necessary to make the Offering Documents not misleading.  These material misrepresentations and omissions fall into three broad categories.

*First*, the Offering Documents made material misstatements and omissions concerning the appropriate holding period for TVIX ETNs.  For example, the Offering Documents included many pages of so-called "Hypothetical Examples" that purported to "illustrate the effect that different factors may have on the Maturity Redemption Amount" of the TVIX ETNs and to "illustrate a few of the potential possible Closing Indicative Values for the ETNs." (A-86).  The Offering Documents repeatedly referred investors to the "Hypothetical Examples" for "a further description of how your payment *at maturity* will be calculated." (A-87, 129) (emphasis added).  However, the Hypothetical Examples illustrated *annual results over twenty years* and a total return *at maturity*, thus falsely implying that TVIX ETNs could be held for extremely lengthy periods and that they would have actual value at maturity when, in fact, they would be worthless many years before then.

The Hypothetical Examples included in the Offering Documents also illustrated results based upon returns or volatilities that were statistically *impossible*, making the Hypothetical Examples completely misleading.  The Hypothetical Examples in the Offering Documents did not illustrate any possible outcome that would (or even could) occur over the illustrated holding periods and did not reflect the far greater extent to which the actual returns on TVIX ETNs

12

depended upon the length of the holding period rather than any change in the Index.

The Offering Documents provided four full-page, graphical illustrations for four different assumed cumulative 20-year returns (as of 2030): +5,150.19%, -87.47%, +45.43%, and -100.00%. Only one of the four cumulative returns used in the illustrations (-100.00%) was even possible; the other three cumulative returns were statistically ***impossible***. Only one illustration (again, for -100.00%) showed no Indicative Value at maturity in 2030, which was virtually certain to be the actual return on TVIX ETNs. In addition, the interim results in all four graphical illustrations – which showed significant value long after two years[6] – also were statistically ***impossible***. (A-88-91). Thus, all four full-page illustrations were materially false and misleading. The Offering Documents repeatedly referred investors to these four materially false and misleading full-page, graphical Hypothetical Examples. (A-129, 130, 136).

In addition, although TVIX ETNs were designed to become worthless in only two years, the Offering Documents repeatedly described ***holding them to maturity*** and repeatedly referred to a principal payment ***at maturity*** when none would be made, as follows:

---

[6] The Offering Documents illustrated significant returns during the 20 year period: 28.67% in year 5, 22.54% in year 10, 65.01% in year 15 and 36.73% in year 20 for a total return of 5,150.19% during one illustrated 20 year period. (A-88).

a.    "For each ETN, ***investors will receive a cash payment at maturity***, upon early redemption or upon acceleration by us that will be linked to the performance of the applicable underlying Index, plus a Daily Accrual and less a Daily Investor Fee (each as defined herein)." (A-93, 120) (emphasis added).

b.    "If your ETNs have not been previously redeemed or accelerated, on the Maturity Date you ***will receive*** for each $100 stated principal amount of your ETNs [. . .] a cash payment equal to the applicable Closing Indicative Value on the Final Valuation Date (the "Final Indicative Value"), as calculated by the Calculation Agents. We refer to the amount of such payment as the 'Maturity Redemption Amount.'" (A-93, 122) (emphasis added).

c.    "Unless your ETNs have been previously redeemed or accelerated, the ETNs will mature on December 4, 2030." (A-94, 127).

These statements falsely implied that TVIX ETNs could or should be held for much longer than a single trading session – indeed, to maturity in 2030 – without adequately disclosing the nature or magnitude of the risk of holding the notes overnight or longer and the certainty that they would be worthless in just two years. The Offering Documents did not otherwise disclose formulas that investors

14

could use to see the virtual certainty of complete loss of principal in just two years or to calculate the risk of substantial loss for even much shorter holding periods.

*Second*, the Offering Documents failed to disclose the quantifiable risk associated with daily rebalancing.[7]  Specifically, the Offering Documents failed to disclose that over holding periods longer than one trading session, daily rebalancing *ensured* that TVIX ETNs would underperform their expected returns each day, resulting in significant loss that became larger every time they were held overnight.  The vague, conditional note in the Offering Documents that TVIX ETNs *might* not perform as expected did not inform investors of the certainty that they would not perform as expected overnight or the magnitude of the loss that would (and did) result.

The Offering Documents omitted information necessary to disclose to investors that: (i) as a result of daily rebalancing, TVIX ETNs were expected to lose value every day over holding periods longer than a single trading session; (ii) that the consequences of rebalancing were mathematically quantifiable; and (iii) the consequences of rebalancing would outweigh any other factor in determining the CIV of TVIX ETNs over time.  (A-79-80).

---

[7]  Rebalancing maintains TVIX ETNs' ability to return twice the Index. Mechanically, rebalancing means increasing exposure to the Index in response to a particular day's gains or reducing exposure in response to that day's losses, as appropriate.

*Third*, the Offering Documents and the February 21, 2012, press release failed to disclose material facts concerning the suspension of new issuances or the bubble in the market price for TVIX EVNs following the temporary suspension of new issuances.  The Offering Documents and the press release did not disclose the risk that, because of the "vertical model" structure for TVIX ETNs, Credit Suisse would be unable to hedge positions it had to assemble to achieve the target daily investment results for the ETNs.  (A-109).  Neither the Offering Documents nor the press release disclosed that the market price for TVIX ETNs would rise dramatically during the suspension period not just as a result of an imbalance in supply and demand, but rather because of illiquidity in the market for TVIX ETNs when short-sellers could not borrow new shares, thus removing downward pressure on the market price of the ETNs.  (A-97-98).  This change dramatically magnified the effect of the suspension on the market price of TVIX ETNs.  The Offering Documents and the press release also failed to disclose that there would be no warning before Credit Suisse resumed issuing new shares, which would immediately cause the market price for TVIX ETNs to return to the Indicative Value.

*Fourth*, the Offering Documents also omitted to state material facts concerning the likelihood that TVIX ETNs could deviate from their intraday Indicative Value and CIV.  In fact, Credit Suisse did not disclose the risk that the

16

market price would collapse as soon as new shares were issued until its press

release on March 22, 2012, announcing the resumption of new issuances:

> Paying a premium purchase price over the Intraday Indicative
> Value of the ETNs could lead to significant losses in the event
> the investor sells such ETNs at a time when such premium is no
> longer present in the market place or such ETNs are accelerated
> (including at our option), in which case investors will receive a
> cash payment in an amount equal to the Closing Indicative Value
> on the Accelerated Valuation Date.

(A 112, 113, 280).  The press release immediately deflated the bubble, causing the

market price to drop precipitously before investors could sell TVIX ETNs at the

bubble price.

## V.    SUMMARY OF THE ARGUMENT

The district court incorrectly determined that the Offering Documents did

not and could not mislead reasonable investors about whether TVIX ETNs should

be held for longer than one trading session.   The Offering Documents

misrepresented and omitted material facts about the nature and magnitude of the

risk of holding TVIX ETNs for longer than one day.  To the contrary, they were

replete with statements – especially four full-page Hypothetical Examples that

were referenced throughout the Offering Documents – falsely indicating that TVIX

ETNs: (i) were suitable for holding longer than one day (indeed, for as long as 20

years) when, in fact, they were certain to lose money over longer holding periods;

(ii) would have substantial value over such longer holding periods when, in fact,

because of the unavoidable cost of daily rebalancing they were certain to become virtually worthless within no more than two years after issuance; and (iii) would be repaid upon maturity in 2030 when, in fact, because the securities were certain to become virtually worthless within two years, there is no chance of any repayment of principal at maturity (or, indeed, at any time close to it). The Offering Documents did not include any information from which reasonable investors could determine for themselves how the effect of daily rebalancing would overwhelm any other effect on the Indicative Values and market prices TVIX ETNs and the magnitude of the risk of holding TVIX ETNs for longer than one trading session.

When all the statements are read together and in context – as they must be – the Offering Documents did not disclose the nature or magnitude of the risk of investing in TVIX ETNs. As the Second Circuit recently explained, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are ***so obviously unimportant*** to a reasonable investor that ***reasonable minds could not differ*** on the question of their importance." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010). All the facts before the district court do not permit that conclusion.

Finally, the Offering Documents did not disclose meaningful information to describe the special risks facing investors during the Dislocation Period. In addition to attributing any impact of suspension of new issues of TVIX ETNs to

18

supply and demand, which created a false impression that demand for the securities would rise during the Dislocation Period, the Offering Documents did not disclose that: (i) demand for TVIX ETNs would fall when short-sellers could not borrow them; (ii) TVIX ETNs would become illiquid during the Dislocation Period; (iii) Credit Suisse could and resume issuing TVIX ETNs at any time and without advance notice; and (iv) investors would be unable to sell their TVIX ETNs before the bubble burst.

Therefore, the Court should reverse the judgment of the district court and reinstate the complaint.

## VI.    ARGUMENT

### A.    Standard of Review

This Court reviews *de novo* a district court's dismissal under Fed. R. Civ. P. 12(b)(6). "We review *de novo* the dismissal of a complaint under [Federal] Rule [of Civil Procedure] 12(b)(6), accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011).

### B.    Motions To Dismiss Section 11 Claims

Plaintiffs assert claims under Section 11 of the Securities Act, 15 U.S.C. §77(k), and "control person" liability claims under section 15 of the Securities Act, 15 U.S.C. § 77o, based on the violations of Section 11.  Where, as here, Section 11 claims sound in negligence rather than in fraud, the complaint need only satisfy the

basic requirements of Federal Rule of Civil Procedure 8(a)(2), rather than the heightened standard set of Rule 9(b).  "[N]otice pleading supported by facially plausible factual allegations is all that is required – nothing more, nothing less." *In re Morgan Stanley,* 592 F.3d at 358.

Section 11 prohibits materially misleading statements or omissions in registration statements filed with the Securities and Exchange Commission ("SEC").  *See* 15 U.S.C. § 77k(a).  "To state a claim under section 11, the plaintiff must allege that: (1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Morgan Stanley*, 592 F.3d at 358-59.

Section 11 requires either an affirmative misstatement of a material fact in an offering document or an omission of material information necessary to make other statements in the offering document not misleading.  *See* 15 U.S.C. §§ 77k(a), 77l(a)(2).  *Morgan Stanley*, 592 F.3d at 360.

A misrepresentation or omission is material if, taken together and in context, the misstated or omitted information "would have misled a reasonable investor.'" *Rombach v. Chang*, 355 F.3d 164, 172 n.7 (2d Cir. 2004) (quoting *I. Meyer Pincus*

20

& *Assocs. v. Oppenheimer & Co*., 936 F.2d 759, 761 (2d Cir. 1991)); *see also*

*DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003).  As the Second Circuit

recently explained, "because the materiality element presents a mixed question of

law and fact, it will rarely be dispositive in a motion to dismiss." *Morgan Stanley*,

592 F.3d at 360.  In fact, "a complaint may not properly be dismissed . . . on the

ground that the alleged misstatements or omissions are not material unless they are

***so obviously unimportant*** to a reasonable investor that ***reasonable minds could***

***not differ*** on the question of their importance."  *ECA and Local 134 IBEW Joint*

*Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009)

(quoting *Ganino v. Citizens Utils*. Co., 228 F.3d 154, 162 (2d Cir. 2000))

(emphasis added); *see also United States v. Gaudin*, 515 U.S. 506 (1995); *SEC v.*

*First Jersey Sec*. *Inc.*, 101 F.3d 1450, 1466-67 (2d Cir. 1996).

　　　　In short, Section 11 "places a relatively minimal burden on a plaintiff."

*Litwin, L.P*., 634 F.3d at 716, *cert denied*, 132 S. Ct. 242 (2011) (quoting *Herman*

*& MacLean v. Huddleston,* 459 U.S. 375, 381-82 (1983)).

### C.　The Complaint Sufficiently Alleges That The Offering Documents Did Not Disclose The Risk Of Holding TVIX ETNs For More Than One Trading Session

　　　　The district court erred in dismissing plaintiffs' Section 11 and 15 claims

because the Offering Documents misled investors about the nature and magnitude

of the risk of holding TVIX ETNs for longer than one trading session.  As

discussed above, over time daily rebalancing costs will swamp the effect of Index volatility on the potential returns on TVIX ETNs, making them *certain* to be virtually worthless within two years after issuance.  The Offering Documents made it appear (incorrectly) that TVIX ETNs (i) would have value long after two years and, indeed, at maturity, and (ii) could provide returns as high as 5,150% at maturity.

Most significantly, the Offering Documents included four full-page graphical illustrations – the Hypothetical Examples – that were neither required to be included in the offering materials nor representative of anything close to how TVIX ETNs were going to perform over time.  As discussed above, three of the four Hypothetical Examples assumed cumulative 20-year returns as of 2030 that were statistically *impossible*.  Only the Hypothetical Example that illustrated a complete loss of principal (-100.00%) was possible, even though that was virtually certain to be the actual return on TVIX ETNs.  All four Hypothetical Examples also included interim results that were statistically *impossible*.  ¶¶ 92-98.

In sum and substance, the full-page Hypothetical Examples, the most prominent feature in the Offering Documents, were utterly false and misleading. And to be sure investors focused their attention on those four misleading illustrations, the Offering Documents repeatedly referred to them.  (A-123, 124, 129).

22

Faced with nearly identical facts, in *In re Direxion Shares ETF Trust*, 279 F.R.D. 221 (S.D.N.Y. 2012), the district court upheld Section 11 claims brought by investors who purchased Direxion (pronounced "direction") ETFs, similar derivative securities whose targeted daily return was three times the inverse of various underlying indices (but not the VIX). In order to achieve the three-times leverage of the Direxion ETFs, the securities were rebalanced each day – exactly like TVIX ETNs in this case. In that case, as here, the plaintiffs alleged that the offering documents for Direxion ETFs included materially false and misleading statements and illustrations that implied a holding period of longer than one trading session. 279 F.R.D. at 232.

For example, the plaintiffs in *Direxion* referred to graphical illustrations of potential results for holding periods of one and three years. 279 F.R.D. at 226-27. Here, the Offering Documents included four graphical illustrations for a holding period of ***20 years***. The full-page, 20-year graphical illustrations in this case are at least as misleading about the appropriate holding period for TVIX ETNs as the one- and three-year illustrations were in *Direxion*.

In *Direxion*, the plaintiffs also referred to "an annual distribution of dividends." 279 F.R.D. at 233. The district court found that the reference to dividends "strongly signaled to investors that holding for a period of longer than one day was appropriate." Here, the Offering Documents for these "notes" –

23

which were ***not*** notes at all – repeatedly referred to repayment of principal in 2030 when, in fact, there will never be repayment of any principal amount. Nonetheless, the mere reference to repayment in 2030 – repeated throughout the Offering Documents – is (yet again) at least as misleading about the appropriate holding period for TVIX ETNs as the reference to "dividends" was in *Direxion*.

As the district court explained in its well-written and thoughtful opinion in *Direxion*, the "critical issue" on liability is whether any cautionary language in the offering materials "adequately disclosed the nature and magnitude of the risks to which investors were exposed." *Direxion*, 279 F.R.D. at 226. In *Direxion*, the district court analyzed that critical issue in light of all the statements in the offering materials, including the so-called warnings about the short-term nature of an investment in Direxion ETFs as well as the multitude of contra-indicators in the offering materials that implied a longer holding period. On the basis of that thorough analysis, the district court concluded in *Direxion* that the holding period disclosures in that case were "undercut" by the contra-indicators of a longer holding period, concluding that the offering documents were misleading ***overall***. *See* 279 F.R.D. at 232-33.

In *Direxion*, the district court properly evaluated the prospectus by reading it as a whole and considering "whether the disclosures and representations, 'taken together and in context, would have misled a reasonable investor about the nature

24

of the securities.'" *In re ProShares Trust Sec. Litig.*, 728 F.3d 96 (2d Cir. 2013); *Morgan Stanley*, 592 F.3d. at 172 n.7 (citation omitted).  Indeed, the district court recognized it was required to do so.  (SPA-9) (citing *Morgan Stanley*).  The district court should have conducted the same detailed, contextual analysis here as in *Direxion*.  Had it done so, the district court would have concluded, as in *Direxion*, that by virtue of the significant contra-indicators present here, the Offering Documents did not disclose the nature of the risk of investing in TVIX ETNs for anything other than a single trading session.

Here, as in *Direxion*, the Offering Documents bristled with contra-indicators falsely stating or implying that TVIX ETNs were appropriate for holding periods much longer than a single trading session.  The Offering Documents included the four full-page graphical illustrations for a holding period of 20 years until 2030.  The illustrations, frequently referred to throughout the Offering Documents, included impossible returns, impossible interim Indicative Values during the 20-year holding period, and an impossible ending Indicative Value in 2030.   In addition, the Offering Documents repeatedly stated that "investors **will receive** a cash payment **at maturity**, upon early redemption or upon acceleration by us . . ." (A-81) (emphasis added).[8]  The assurances of a pay-out at maturity falsely implied

---

[8] The fact that TVIX ETNs did not "guarantee any return of principal at maturity" most certainly does not carry the same warning that the possibility of ***any*** return of principal at maturity – let alone just two years after issuance – was zero.

that TVIX ETNs would have value and would be redeemed in 2030 or sooner when in fact, they were certain to be virtually worthless only two years after issuance and never will be redeemed. This created an overall false and misleading impression that TVIX ETNs could be held much longer than one trading session.

Instead, the district court improperly viewed these materially false and misleading statements in isolation on the one hand, and in light of all generalized warning statements on the other. This upside down analysis led the district court to conclude erroneously that plaintiffs "could not have reasonably concluded that the TVIX ETNs could appropriately be held until maturity." (SPA-16).

As plaintiffs first explained in the district court, *ProShares*, a factually dissimilar case, should not affect the analysis or outcome here. In *ProShares*, the plaintiffs alleged that the defendants failed to disclose certain risks associated with investments in the ETFs, including the risk that the ETFs would likely lose substantial value in a relatively brief period of time, especially in periods of high volatility. *In re ProShares Trust Sec. Litig.*, 889 F. Supp. 2d 644 (S.D.N.Y. 2012). The district court dismissed that complaint because, unlike here and in *Direxion*, the plaintiffs in *ProShares* identified "no such language in the registration statements that specifically contemplates an investment strategy of holding for longer than one day." *Id*. at 654-55.

26

More specifically, the plaintiffs in *ProShares* pointed to a number of so-called "wedge graphs" illustrating performance over one-, three-, five-, and ten-year periods that allegedly encouraged ProShares investors to hold their investments for longer than one day. The district court rejected that argument for two reasons. *First*, the district court found that "the wedge graphs indicate that, as volatility increases, the potential losses to the ETFs over periods longer than one day increase, even in cases where the underlying index performs as the ETF investor expected over that period." *Id*. at 651 (citation omitted). In other words, the *ProShares* wedge graphs "illustrate graphically the exact 'must lose' scenarios that form the crux of the plaintiffs' claim." *Id.* at 655. *Second*, the district court found that SEC disclosure requirements ***required*** the projections to be included in the registration statements. *Id. See also ProShares*, Feb. 2, 2012 Hrg. Tr. at 19:7-19:17 (all statements in prospectus that look to one-, three-, and five-year statistics were required by SEC Form N-1A).

Unlike the wedge graphs in *ProShares*, however, the Hypothetical Examples included in the Offering Documents in this case were not required by any SEC regulations. *ProShares* involved an open-ended investment company registered with the SEC under the Investment Company Act of 1940. The offering materials in that case had to comply with Form N-1A. This Court affirmed the district court's finding that Form N-1A required the prospectus to include a performance

27

table showing the fund's returns for one-, three-, five-, and ten-year periods compared with the returns for a broad measure of market performance for the same periods. *ProShares*, 728 F.3d at 106.

TVIX ETNs are not registered under the Investment Company Act and, consequently, Defendants were not required to prepare the Offering Documents in conformity with Form N-1A. Defendants have not suggested otherwise.

Furthermore, unlike the wedge graphs, which illustrated the "must lose" scenario in *ProShares*, the Hypothetical Examples in the Offering Documents here did not illustrate how TVIX ETNs would perform over time. The Hypothetical Examples in the Offering Documents were not representative of the most likely outcome of investing in TVIX ETNs over the illustrated holding period; they did not reflect the virtual certainty that actual returns depended on unavoidable rebalancing costs and the length of the holding period rather than Index volatility. *Id*. To the contrary, the Hypothetical Examples that were added to the Offering Documents illustrated results that were statistically impossible and, therefore, meaningless to reasonable investors. (A-87). Thus, unlike the wedge graphs in *ProShares*, the Hypothetical Examples did not illustrate a "must lose" scenario for TVIX ETNs; rather, they falsely illustrated profitable results over a 20-year period.

Without any analysis, the district court incorrectly held that Item 202(b)(1) of Regulation S-K mandates disclosure of "provisions with respect to maturity."

28

(SPA-16).   But Item 202(b)(1) only requires such disclosures with respect to maturity "***as are relevant***."   *Id*.   If TVIX ETNs never will reach maturity, or will be virtually worthless at (or long before) maturity, then provisions with respect to maturity are ***irrelevant***.   Item 202(b)(1) does ***not*** require disclosure of irrelevant information.   The district court cited no authority regarding Item 202(b)(1) and overlooked the important limitation on the disclosure requirements thereunder.   For that additional reason, the district court's decision must be reversed.[9]

In *ProShares*, the district court distinguished *Direxion* on the basis that contra-indicators in Direxion's registration statements were in close proximity to other statements that described the ETFs' nature and limitations, which "'undercut' the emphasis on the 'daily' nature of the ETFs."   The plaintiffs in *ProShares* could not to identify any "such language in the registration statements that specifically contemplates an investment strategy of holding for longer than one day" or any other statement tending to "undercut" the warning about the short-term holding period for the ETFs.   *ProShares*, 889 F. Supp. 2d at 654 (citation omitted).[10]

---

[9] Even if the disclosures were required by Item 202(b)(1), they must be accurate. *ProShares*, 728 F.3d at 106.   As discussed throughout this brief, the Hypothetical Examples in the Offering Documents were ***not*** representative of ***any*** possible outcome of investing in TVIX ETNs over the illustrated holding periods and were, therefore, inaccurate and misleading.

[10] Indeed, in *Direxion*, the pricing supplements "contained numerous references to the [f]unds as 'daily' investment vehicles, but also contained references to holding for periods of longer than one day, and examples of and discussions about holding for periods of one to three years."   279 F.R.D. at 226-27.

Here, as in *Direxion* but unlike in *ProShares*, the contra-indicators that referred to or implied long holding periods for TVIX ETNs were adjacent to other statements in the Offering Documents referring to them as daily investments. For example, the Hypothetical Examples were directly next to statements that "you are likely to lose part or all of your initial investment" and "[f]or each ETN, investors will receive a cash payment at maturity." Similarly, the statement that "in almost any potential scenario the Closing Indicative Value of your ETNs is likely to be close to zero after 20 years" is immediately followed by a Hypothetical Example that illustrated a CIV of $5,250.19 after 20 years. (A-137, 140). Likewise, a paragraph in the Offering Documents includes a statement that "[t]he ETNs are designed as short-term trading vehicles for investors managing their portfolios on a daily basis" and another statement that "the performance of each ETN [. . .] will be dependent on the path of daily returns ***during the holder's holding period***." (A-84) (emphasis added). Since daily returns have a "path" only after more than one day, referring to a "path" during the "holder's holding period" plainly implied a holding period of more than two days.

The juxtaposition of inherently misleading contra-indicators, which were absent from the registration statement in *ProShares*, led the district court to uphold

the complaint in *Direxion* and should have led the district court to do likewise here. *Cf. Direxion*, 279 F.R.D. at 232-33, and *ProShares*, 889 F. Supp. 2d at 654-55.[11]

For these reasons, the district court's holding that the Offering Documents adequately informed investors of the risk of holding TVIX ETNs for longer than a single trading session was in error and should be reversed.

### D. The Offering Documents Did Not Disclose The Magnitude Of The Risk of Holding TVIX ETNs For Longer Than One Trading Session

Plaintiffs allege that the Offering Documents were materially false and misleading because they failed to disclose the quantifiable risk associated with rebalancing and failed to disclose that over holding periods longer than a single trading session, daily rebalancing virtually ***ensured*** that TVIX ETNs would underperform their expected returns each trading day.[12]   More specifically, the

---

[11] *See also Freidus v. ING Groep N.V.,* 736 F. Supp. 2d 816, 841 (S.D.N.Y. 2010) ("extensive" and "detail[ed]" risk disclosures were insufficient where they were undercut by other statements and where other risks were accentuated; court could not "conclude as a matter of law that no reasonable investor would have found additional disclosures . . . immaterial as a matter of law"); *In re Citigroup Bond Litig.,* 723 F. Supp. 2d 568, 589 (S.D.N.Y. 2010) (Section 11 liability for "under represent[ing] the full scope of risk . . . while defendants began disclosing some exposure to subprime-backed CDOs in July 2007, those disclosures materially misstated and underrepresented the full scope of risk.")

[12] Because TVIX ETNs were highly engineered to achieve their daily investment objective, a two-times multiple of the daily change in the Index, their composition had to be "rebalanced" every day.  Rebalancing transactions are always made in the same direction as the Index.  Consequently, TVIX ETNs' rebalancing requires buying when the Index is up, and selling when the Index is down.  The need for daily rebalancing is unique to leveraged and inverse ETNs.  Rebalancing

complaint alleges that TVIX ETNs lost a small but unavoidable percentage of their return every day, making it ***impossible*** for them to achieve their target return over ***any*** holding period longer than a single trading session.  (A-84-85).

Plaintiffs allege that the mathematical formula defendants used to achieve the investment objective of TVIX ETNs meant that actual results over time would correlate with the length of the holding period, ***not*** with volatility of the Index. Plaintiffs allege that the Offering Documents did not disclose the correlation in the Offering Documents, and certainly never disclose that TVIX ETNs were certain to become virtually worthless ***within two years*** and would not be redeemed at maturity because of the resulting cumulative daily decay.  In short, the mechanics of daily rebalancing caused TVIX ETNs to underperform their target returns and caused plaintiffs to suffer investment loss because they held TVIX ETNs for longer than one trading session.[13]

---

necessarily incurs costs, which reduces the actual return earned by the investment each day.  Moreover, as the volatility of the Index increased, the amount of rebalancing required each day and the associated rebalancing costs also increased. Moreover, and significantly, as a simple mathematical proposition, as the holding period grew longer, volatility greatly diminished TVIX ETNs' results over the longer holding period.  Therefore, the actual returns earned by TVIX ETN holders were subject to vast and mostly negative deviations from anticipated results over holding periods longer than a day, particularly as the actual holding period grew. Plaintiffs alleged this rebalancing risk in detail in the complaint.  (A-84-86).

[13] Specifically, any leveraged fund that is rebalanced daily (like TVIX ETNs) will deteriorate at a daily rate of $k(k-1)/2$ x sigma^2.  Here, t = +2, so $k(k-1)/2 = 1$, so the formula is simply: daily rebalance decay = daily variance of returns.  (A-84-85).

The district court found that plaintiffs failed to state a claim because the Offering Documents "included mathematical examples demonstrating for investors how rebalancing," from which it concluded, "the fact that the TVIX ETNs' value was likely to erode was thus made obvious to a reasonable investor." (SPA-11). However, the Offering Documents *did not* include any such mathematical examples, and the examples cited by the district court *do not* pertain to rebalancing at all, much less show the overwhelming effect of rebalancing on the value of TVIX ETNs.

The "mathematical examples" cited by the district court on PS 28-29 (A-152-53)) refer to compounding rather than rebalancing. Compounding works as follows: a 5% increase on a $100 investment results in $105, but a subsequent 5% decrease, applied to the $105, magnifies the loss and results in a value of $99.75 rather than the initial $100 investment. While compounding had some effect on TVIX ETNs, it is not the same as rebalancing, compounding did not harm the ETNs to nearly the same extent as rebalancing, and the examples of compounding cited by the district court did not illustrate rebalancing at all.[14]

The Offering Documents did not explain the mechanics of rebalancing or the dramatic effect it was certain to have on TVIX ETNs in any meaningful way. The

---

[14] In fact, while compounding pertains to both levered and unlevered funds (both of which are described in the Offering Documents), rebalancing pertains *only* to levered funds like TVIX ETNs.

33

district court simply confused these two concepts, leading it to a plainly erroneous finding.

Even that confusion should not have led the district court to dismiss the complaint.  In *Rafton v. Rydex Series Funds*, No. 10-CV-01171-LHK, 2011 U.S. Dist. LEXIS 707, at *2 (N.D. Cal. Jan. 5, 2011), the Northern District of California sustained a Section 11 claim based on the failure to disclose sufficient information about the effect of compounding.  In that case, the plaintiffs purchased shares of an ETF designed to deliver returns equal to the inverse of returns for 30-Year U.S. Treasury Bonds.  The plaintiffs alleged that the defendants failed "to adequately disclose a 'mathematical compounding effect' that would cause the Fund to deviate from its benchmark."  *Id*.  Finding that the defendants included only "general and ambiguous" disclosures of the effect of compounding, the California district court upheld a claim that the defendants "failed to disclose the magnitude of the risk they faced by holding the Fund for longer than a single day because of the inevitable effect of compounding."  *Id.* at *23-24 (citation omitted).[15]  In doing so, the district

---

[15] The plaintiffs in *Rafton* alleged that the offering documents in that case "did not disclose that the daily tracking of the Fund necessarily implicates a mathematical compounding effect that will lead to deviation from the benchmark" and that the offering documents "made [only] a general statement that 'tracking error' is 'possible' or 'may' occur." *Id*. at *21.  The Northern District of California rejected the defendants' argument "that they repeatedly disclosed: 1) the Fund's daily investment objective; and 2) the potential effects of compounding over time" and denied defendants' motion to dismiss the complaint because their arguments, the

court noted that the registration statement included only "conditional language that mathematical compounding 'may' prevent a Fund from correlating with the benchmark" when that risk was virtually certain. *Id*. at *23.

The district court sought to distinguish *Rafton* on the basis that the registration statement in that case was "equivocal about the effects of market volatility and longer term holdings." (SPA-12). Here, the Offering Documents contained only a single vague and conditional statement that purportedly warned investors of rebalancing risk: "[d]aily rebalancing will impair the performance of each ETN *if* the underlying Index experiences volatility." (A-162) (emphasis added). The conditional statement about rebalancing here is no less "equivocal" than the disclosures in *Rafton*.[16] In fact, the statement here is virtually meaningless

---

same ones Defendants make here, were "insufficient, at least at the pleading stage, to overcome Plaintiffs' allegations." *Id*. at *21-22.

[16] The offering documents in *Rafton* contained the following similar purported disclosures, many of which are virtually identical to those at issue here: (i) "[t]he return of each Fund for periods longer than a single day, especially in periods of market volatility, may be completely uncorrelated to the return of the Fund's benchmark for that longer period"; (ii) "The Funds should be utilized only by sophisticated investors or professional investment advisors who (a) understand the risks associated with the use of leverage; (b) understand the consequences of seeking investment results on a daily basis; (c) understand the risk of shorting; and (d) intend to actively monitor and manage their investments on a daily basis"; (iii) the Fund is "not intended to be used by, and are not appropriate for, investors who do not intend to actively monitor and manage their portfolios" and "the path or trend of the benchmark during the longer period may be at least as important to the Daily Leveraged Fund's or Inverse Fund's return for the longer period as the cumulative return of the benchmark for the relevant longer period." *Id*. at *14-15 (citation omitted).

because the VIX – itself a measure of market volatility – was ***certain*** to experience volatility.  (A-84) (emphasis added).

This Court should reverse the district court's decision for the same reason the Northern District of California denied the motion to dismiss in *Rafton*.  The Offering Documents here included the same kind of conditional and vague statements that were held actionable in *Rafton*, and were no more informative to TVIX ETN investors than the statements were in that case.  There is no principled basis to distinguish the analysis in *Rafton* from this case.

 Significantly, the Offering Documents nowhere contained any information adequately describing the ***magnitude*** of rebalancing risk – indeed, the virtual ***certainty*** that TVIX ETNs would lose value every day because daily rebalancing costs outweighed the effect of volatility in the Index until they became virtually worthless in less than two years.  The lone statement in the Offering Documents was grossly inadequate to convey the virtual ***certainty*** of daily decay ***or*** the magnitude of the risk of loss over longer holding periods.

For that reason alone, the conditional "warning" is materially incomplete and misleading. "[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described." *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig*., 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011) (quoting *In re Am. Int'l Grp.,*

36

*Inc.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) (internal quotation omitted)). *See also N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, 08-5653 (PAC), 2010 U.S. Dist. LEXIS 47512, at *18 (S.D.N.Y. Mar. 29, 2010) ("disclosures fail to make clear the magnitude of the risk"); *In re Am. Int'l Group, Inc.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) (disclosures inadequate "if they fail to disclose hard facts critical to appreciating the magnitude of the risks described") (quotation and citation omitted).

The vague and conditional warning in the Offering Documents is plainly inadequate under this Court's prior decision in *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723 (2d Cir. 1998). The prospectuses in that case warned that certain hedging activities "might fail." 159 F.3d at 729. The plaintiffs alleged that the warning was inadequate because there were no hedging opportunities available. *Id*. The Court agreed with the plaintiffs: "That the prospectuses disclosed the possible inefficacy of hedges does not shield the Fund from liability for misrepresenting the availability of hedging opportunities," which the Court found was "a different contingency." *Id*.

As in *Hunt*, the conditional statement in the Offering Documents that rebalancing would affect TVIX ETN returns "***if*** the underlying Index experiences volatility" is a different contingency than plaintiffs allege was misrepresented. In no way does that statement convey the ***certainty*** that TVIX ETNs would become

37

virtually worthless within two years because rebalancing costs overwhelm the potential effect of Index volatility over time. And in no way does that statement quantify the effect of rebalancing on the performance of TVIS ETNs. These risks and their magnitude are "different contingencies" than what is addressed in the conditional statement, and for that reason alone the Offering Documents are materially misleading. *Hunt*, 159 F.3d at 729.

### E. The District Court's Conclusion That The Offering Documents Could Not Mislead Investors Is Belied By Regulatory Action And The Undisputed Facts

The district court concluded that the Offering Documents could not have led "a reasonable investor to conclude that holding TVIX ETNs on a longer than daily basis was an appropriate investment strategy, much less one that could conceivably be profitable." (SPA-18). That conclusion is fundamentally inconsistent with what actually happened and is contradicted by regulatory action taken after TVIX ETNs fell precipitously in March 2012.

The lead plaintiffs here, Elite Aviation LLC and Endless H3, were sophisticated investors who purchased a large number of TVIX ETNs between November 2011 and January 2012 and held the securities until June 2012. (A-23-56). Despite their experience and sophistication as investors and the amounts they invested, the lead plaintiffs held the securities for approximately six months. The district court's conclusion that "a reasonable investor could not have concluded

that holding TVIX ETNs for any period was appropriate or recommended," (SPA-18), is at odds with the lead plaintiffs' own investment activity.

More importantly, the district court's conclusion is squarely refuted by regulatory activity following the large loss in TVIX ETNs. FINRA was extremely concerned about investor misunderstanding of leveraged ETN risks. That concern caused FINRA to issue a regulatory and examination priorities letter (the "Priorities Letter") on January 11, 2013, FINRA (A-292-300). The Priorities Letter identified issues FINRA "will focus in the coming year." *Id*. Under the heading "Exchange-Traded Funds and Notes," FINRA stated: "Retail investors may not understand the . . . risks associated with [ETNs], particularly those that employ leverage to amplify returns"). *Id*. Plainly, FINRA believed that investors could be misled about the risk of holding ETNs for longer than one trading session.

### F. The Complaint Does Not Allege Any Failure to Predict The Future Or To Disclose Publicly Available Information

The district court held that defendants had no duty to "predict future market performance" or disclose publicly available volatility trends. (SPA-12). The district court misunderstood the complaint: plaintiffs have not alleged that defendants had a duty to predict the future or disclose any publicly available information. As alleged in the complaint, daily decay from rebalancing is certain and the magnitude of that decay costs is mathematically quantifiable. (A-84-86). The complaint also alleges that the cumulative effect of daily decay is more

significant than any other factor affecting the Indicative Value of TVIX ETNs. *Id*. The Offering Documents did not disclose either the inevitability of daily decay from rebalancing or the magnitude of the effect of rebalancing on TVIX ETNs.

None of those facts is a prediction about the future; they are all facts about characteristics of TVIX ETNs that always existed. The failure to disclose those facts had nothing to do with predicting the future, and everything to do with disclosing known present risks and known present certainties.

The district court also held that the allegations that rebalancing would cause TVIX ETNs to underperform their expected returns by an average of 24 basis points each trading day are based on "a retrospective analysis of the historical data." (SPA-12). That conclusion misses the point. Plaintiffs do allege that TVIX ETNs have decayed by an average of 24 basis points since they were issued. (A-66, 84, 86, 113). But the precise rate of decay – whether 20 or 25 or 30 basis points – is not pertinent. Rather, what is pertinent is that volatility is persistent and predictable: defendants could and should have warned TVIX ETN investors that daily rebalancing *would* cause significant and repetitive underperformance on a daily basis versus the Index and huge loss in absolute returns. For longer holding periods, the underperformance and loss *will* be greater. The persistence and predictability of underperformance meant that TVIX ETNs would become worthless in just two years after TVIX ETNs were first offered to the public,

40

exactly as happened. There was nothing uncertain or unknown about any of those facts.

Based on historical volatility of the VIX, investors should have been warned to expect a daily decay of between 25 and 57 basis points per day. [17] That is not the same as disclosing the underlying VIX volatility data itself. That disclosure was unnecessary, but more importantly, it would have been inadequate. Without knowing the extent to which the return on TVIX ETNs was dependent upon daily rebalancing costs (*i.e.*, the magnitude of the effect of rebalancing on performance), knowing the historical volatility of the Index would have done little to inform investors of the real risks they faced. Historical VIX volatility data is part of the total mix of information, but without meaningful disclosure of the extent of the risk over time, the historical data alone would have been practically meaningless and insufficient to inform investors of the real risk they faced.

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003), does not support the district court's decision. That case merely held that a defendant cannot be found liable "for failing to disclose . . . information

---

[17] The Court may take judicial notice of publically available VIX volatility figures during the period prior to the issuance of TVIX ETNs. *See In re DDAVP Indirect Purchaser Antitrust Litig.,* No. 05-CV-2237 (CS), 2012 U.S. Dist. LEXIS 149588, at *14 (S.D.N.Y. Oct. 16, 2012) ("[I]t is well established that courts may take judicial notice of publically available documents on a motion to dismiss." Citing, *Byrd v. City of N.Y.*, No. 04-CV-1396, 2005 U.S. App. LEXIS 10820, at *4 (2d Cir. June 8, 2005) (summary order)).

[that] was already public.  Sections 11 and 12(a)(2) do not require the disclosure of publically available information."  *Id*. at 249-50.  But the fact that TVIX ETNs would be rendered worthless two years from issuance was undoubtedly ***not*** publically available.  The district court's opinion improperly conflates publically available information concerning historical VIX volatility with the undisclosed fact that TVIX ETNs would decline rapidly because of daily rebalancing costs and would become worthless within two years of issuance as a result.

### G.   The District Court Improperly Decided That The Alleged Misrepresentations And Omissions Were Immaterial As A Matter Of Law

The district court also dismissed the complaint on the basis that "Plaintiffs have not pleaded plausibly that a reasonable investor could have read the Offering Documents without understanding that the daily balancing and leveraging features of the TVIX ETNs exposed investors to the risk of significant losses if they held the securities for more than a day."  (SPA-14-15).

The district court improperly determined that the alleged misrepresentations and omissions were not material as a matter of law.  Materiality "presents a mixed question of law and fact, it will rarely be dispositive in a motion to dismiss."  *Morgan Stanley*, 592 F.3d at 360.  Accordingly, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that

reasonable minds could not differ on the question of their importance." *ECA*, 553 F.3d at 197.

The District Court's decision presumes investors would have read only those parts of the Offering Documents that generally informed them TVIX ETNs tracked the Index daily, while ignoring other parts of the Offering Documents that implied they could or should be held for much longer than one day.  In *Direxion*, 279 F.R.D. at 232-33, the district court rejected such an approach, which requires the Court to read the Offering Documents selectively and ignore the various contra-indicators that strongly implied holding periods of longer than a single day.  It was error for the district court to use it here.

The alleged misrepresentations and omissions are in no way so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.  Any reasonable investor would consider it important to know what factors would predictably affect his investment and how the investment will be affected.  Just knowing that daily decay is so certain and predictable would have helped investors understand that TVIX ETNs should not be held longer than one trading session.  In fact, it is difficult, if not impossible, to imagine anything more important to investors than the certainty of substantial loss of principal over a relatively short period of time.  The district court simply misunderstood this.

43

As discussed above, the Offering Documents included four Hypothetical Examples that purported to "illustrate the effect that different factors may have on the Maturity Redemption Amount" of the TVIX ETNs and to "illustrate a few of the **_potential possible_** Closing Indicative Values for the ETNs.  The Offering Documents repeatedly referred to the Hypothetical Examples as if they described how a real "payment at maturity will be calculated."  (A-86).  The Hypothetical Examples did not represent of any possible outcome of investing in TVIX ETNs over the illustrated holding periods.[18]

Nevertheless, the district court considered only the statements that preceded the charts to conclude that "a reasonable investor could not have concluded that holding TVIX ETNs for any period was appropriate or recommended" because the "hypothetical examples do not specifically contemplate an investment strategy of holding for longer than one day."  (SPA-17).  The district court simply ignored the

---

[18] Statements accompanying the Hypothetical Examples charts strongly supports plaintiffs' argument, such as:  (1) the illustrations are "intended merely to illustrate a few of the potential possible Closing Indicative Values for the ETNs" (in fact, three of the charts illustrated mathematically impossible CIVs at the end of twenty years); (ii) "your payment upon redemption or acceleration would be based on the Closing Indicative Value of the ETNs" (in fact, no payment upon redemption will ever be made); (iii) "Each of these four examples is a random possibility generated by a computer among an infinite number of possible outcomes" (in fact, the inputs of returns and volatilities were so unlikely to occur as to be statistically insignificant and meaningless to reasonable investors);  (iv) "in almost any potential scenario the Closing Indicative Value of your ETNs is likely to be close to zero after 20 years" (in fact, in every statistically likely scenario, the CIV of TVIX ETNs was certain to be close to zero after just 2 years). (A-136-137).

multiple contra-indicators assuring payment at maturity, the full-page charts illustrating potentially lucrative returns over the 20-year holding period, and statements about the directional change of returns "during the holder's holding period."

The Offering Documents must be read in their entirety (including the numerous contra-indictors), not selectively (ignoring everything except the vague statement that TVIX ETNs sought to track "daily" movements in the Index). *See DeMaria*, 318 F.3d at 180 (citation omitted) (to determine materiality of allegedly false or misleading statements or omissions, registration statement must be read "as a whole"); *In re AMF Bowling Sec. Litig.,* 99 Civ. 3023 (DC), 2001 U.S. Dist. LEXIS 3182, at *11 (S.D.N.Y. Mar. 22. 2001) (citation omitted) (to determine materiality, "prospectus must be read as a whole").

Even the so-called "warnings" cited by the district court implied holding TVIX ETNs for longer than one day. For example, the district court quoted the Offering Documents as saying that the returns on TVIX ETNs would depend in part on "the path of daily returns *during the holder's holding period*." (SPA-17) (emphasis added). A "path" of daily returns occurs over days; referring to a "path" during the "holding period" implies holding for more than two days.

The District Court simply ignored these contra-indicators.

45

### H.    The Dislocation Period Allegations Are Sufficient

The district court dismissed plaintiffs' Dislocation Period allegations, erroneously holding that: (i) "the reason why the new issuances were suspended was immaterial" (SPA-22); (ii) investors were adequately warned that a restriction in supply of TVIX ETNs would affect secondary market prices (SPA-23); and (iii) Credit Suisse's vertical platform was adequately disclosed to investors. *Id*. In fact, it was only *after* Credit Suisse announced that it would resume issuing TVIX ETNs – and *after* Credit Suisse deflated the bubble created by its suspension – that investors were adequately informed of these issues. Consequently, the District Court erred in dismissing plaintiffs' Dislocation Period claims.

On February 21, 2012, Credit Suisse announced that it was temporarily suspending further issuances of the TVIX ETNs because it reached purported "internal limits" on the size of the notes. Without any further explanation, Credit Suisse said only that "the suspension . . . *may* influence the market value of the ETNs" and that "Credit Suisse believes it is possible that the temporary suspension of further issuances *may* cause an imbalance of *supply and demand* in the secondary market for ETNs, which *may* cause the ETNs to trade at a *premium or discount* in relation to their Indicative Value." (A-95) (emphasis added). The vague and heavily qualified press release provided no meaningful information about the actual risk of purchasing TVIX ETNs during the Dislocation Period,

46

provided no information on the nature, scope, or terms of the purported internal limits on the size of the TVIX ETNs.  Most importantly, the press release did not inform investors that it could or would resume issuing TVIX ETNs without any notice or warning, or that a resumption of issuing the securities would cause the price of TVIX ETNs to drop immediately.[19]

By March 21, 2012, the market price for TVIX ETNs had nearly doubled and they traded at a 90% premium above their Indicative Value.  The premium over Indicative Value was not caused by any imbalance in supply and demand in the secondary market, as the February press release said would be the case.  To the contrary, as alleged in detail in the complaint, the supply of TVIX ETNs remained constant because no new notes were issued, while demand actually *fell* during the Dislocation Period, as was evidenced by the decline in trading during the Dislocation Period.  (A-98).  Such a decline in demand implies a *drop* in the market price for TVIX ETNs.  Instead, the market price rose dramatically, almost doubling in just 30 days.  (A-96).

The rapid increase in market price for TVIX ETNs during the Dislocation Period was not caused by an imbalance in supply and demand.  Instead, as alleged in the complaint, the price rise was the result of a lack of borrowable ETNs, which

---

[19] In fact, defendants have never disclosed any information about the purported "internal limits."  Credit Suisse currently issues new TVIX ETNs on a regular basis, most recently more than $14 million worth on July 30, 2014, but has not explained how the purported "internal limits" no longer apply.

caused investors to be unable sell their shares during the Dislocation Period because of the lack of potential buyers at the elevated secondary market prices. (A-98). This prevented short-selling, which naturally imposes downward pressure on the market price for any security (including TVIX ETNs). Without that downward pressure, the market price for TVIX ETNs rose dramatically – effectively, creating a price bubble.

The press release did not inform investors of the actual market effect of the suspension. By attributing the potential effect that the suspension might have on price to supply and demand, and in the absence of any disclosure in the Offering Documents, Credit Suisse led investors who purchased TVIX ETNs during the Dislocation Period reasonably to expect a constant or growing demand for the notes in the secondary market that would not be met if the number of available shares were restricted. Despite that reasonable expectation, Dislocation Period investors were unable to sell their shares during the Dislocation Period because of the lack of potential buyers at the secondary market prices. (A-102).

In other words, rather than purchasing securities that should be easy to sell because of an imbalance in supply and demand noted in the February press release, Dislocation Period investors bought TVIX ETNs with two apparently conflicting qualities: a bubble price but declining demand. This left Dislocation Period investors owning TVIX ETNs at a bubble price but no way to dispose of the shares

before Credit Suisse resumed issuance of the ETNs – which would (and did) deflate the bubble and cause an immediate drop in the market price back to the Indicative Value.

That is exactly what happened. Dislocation Period investors suffered significant economic damage – losing over $340 million – when Credit Suisse announced that it would immediately resume issuing TVIX ETNs. (A-102).

The complaint alleges that a reasonably prudent investor, having read the Offering Documents, including the February press release, would not and could not have understood the unusual risk of illiquidity caused by defendants' decision to suspend issuing TVIX ETNs. (A-111). Vague and equivocal "warnings," such as the February press release, which mean that favorable events are just as likely to occur as adverse events, do not inform reasonable investors and are not adequate or material disclosures.[20] Defendants' vague and equivocal statements provided no substantive information regarding the likelihood or potential magnitude of the substantial risk of illiquidity faced by TVIX ETN investors during the Dislocation

---

[20] The complaint does not allege that Defendants failed to predict the "precise manner in which risks will manifest themselves" as the District Court held. (SPA-22). Instead, the complaint simply alleges that a reasonably prudent investor, having read the Offering Documents – including the February 21, 2012, press release – would not and could not have understood the specific risk of illiquidity brought about by Defendants' decision to suspend issuance of additional TVIX ETNs. *In re ProShares,* 889 F. Supp. 2d at 655.

Period.[21]   Moreover, it is a question of fact as to whether a reasonable investor would consider the Defendants' vague and equivocal statements to be adequate. *See Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 185 (2d Cir. 2001) (information about even a "relatively improbable event" may be material to investors because of magnitude of potential impact).

The district court relied on *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662 (S.D.N.Y. 2008).  But in that case, the alleged omissions concerned future "events that were either unknown or unknowable at the time of the disclosures." 538 F. Supp. 2d at 664 (emphasis added).  The facts here stand in stark contrast.  Specifically, the February press release falsely stated that the suspension might cause an imbalance in supply and demand, which reasonably implied that the market price would rise as supply was restricted and demand either stayed constant or rose.  In fact, supply remained constant and demand fell; the market price rose because TVIX ETNs became illiquid and could not be borrowed for short-selling.  (A-67, 97).  There were no affirmative misrepresentations in *Panther Partners*, but rather, only alleged omissions.

In addition, unlike in *Panther Partners*, defendants certainly knew the real risks faced by Dislocation Period investors, but chose not to disclose them until the

---

[21] The statement that TVIX ETNs may "trade **at a premium or discount** in relation to their Indicative Value" conveyed no meaningful information about the impact of the suspension; it merely acknowledges the possibility of ***both*** potential outcomes.

*end* of the Dislocation Period.  On March 22, 2012, defendants announced the immediate resumption of issuance of TVIX ETNs.  In the March press release, they discussed the illiquidity issue that should have been disclosed in the February press release: "if we stop selling additional ETNs, the price and *liquidity* in the secondary market could be materially and adversely affected."  (A-103) (emphasis added).  The March press release also, albeit belatedly, warned investors of the risks associated with resuming the issuance of TVIX ETNs: "It is possible that the resumption of new issuances of the ETNs, even on a limited basis, could reduce or remove any premium in the trading price of the ETNs over their Indicative Value. Investors are cautioned that paying a premium purchase price over the Indicative Value of the ETNs could lead to significant losses in the event the investor sells such ETNs at a time when the premium is no longer present in the market place or the ETNs are accelerated (including at our option), in which case investors will receive a cash payment in an amount equal to the closing Indicative Value on the accelerated valuation date."  (A-101).  Both of these disclosures should have been made in the February press release when investors could make informed decisions about buying TVIX ETNs during the Dislocation Period, rather than in the March press release when it was too late for them to do anything but count their losses.

Moreover, the February press release did not disclose that Credit Suisse could or would resume issuing TVIX ETNs suddenly and without notice or

warning at any time, a fact entirely within its control and thus, unlike the alleged omitted information in *Panther Partners*, entirely knowable and known. This information was incredibly important to Dislocation Period investors, who would be left holding TVIX ETNs at the bubble price when the bubble burst.

For these reasons, the district court's decision to dismiss the Dislocation Period allegations was in error and should be reversed.[22]

## VII.  CONCLUSION

For the reasons given above, plaintiffs respectfully request that this Court reverse the ruling of the court below granting defendants' motion to dismiss the complaint and remand to the district court for further proceedings.

---

[22] The Offering Documents also omitted material information concerning the risks associated with the TVIX ETN's "vertical model" platform.  Given the vertical model, Credit Suisse was the issuer, market-maker, and swap provider on TVIX ETNs.  It was also the primary source to hedge the ETNs through swaps and other transactions with its subsidiaries and affiliates.  Credit Suisse's motivation to keep all of the business in house was clear - it earned the bank significant fees on multiple sides of the transaction.  The Offering Documents failed to disclose how the vertical model rendered hedging more difficult, rendering the ETNs difficult to hedge, prone to suspension and extremely risky.   These risks were not "unknowable" and did not materialize *after* suspension; rather, they could have and should have been disclosed in the Offering Documents and February 2012 press release, *prior* to suspension.

Dated: August 12, 2014                Respectfully submitted,

/s/ Mark C. Rifkin
Mark C. Rifkin, Esq.
rifkin@whafh.com
Matthew M. Guiney, Esq.
guiney@whafh.com
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600

***Plaintiffs' Lead Counsel***

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains exactly 12,695 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

_____/s/ Mark C. Rifkin_____

*Attorney for Appellants*

**SPECIAL APPENDIX**

**i**

## TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Laura Taylor
Swain, dated June 9, 2014 .................................... SPA-1

Judgment, dated June 10, 2014 ................................. SPA-25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

In re TVIX Securities Litigation

-------------------------------------------------------x

THIS DOCUMENT RELATES TO:                    MASTER FILE NO.
ALL ACTIONS                                  No.  12 Civ. 4191 (LTS)

-------------------------------------------------------x

OPINION AND ORDER

APPEARANCES:

WOLF HALDENSTEIN ADLER              DAVIS POLK & WARDWELL LLP
FREEMAN & HERZ LLP
  By:  Gregory M. Nespole, Esq.       By:  James H.R. Windels, Esq.
       Mark C. Rifkin, Esq.                Emmet P. Ong, Esq.
       Matthew M. Guiney, Esq.             Melissa C. King, Esq.
       E. Joshua Rosenkranz, Esq.
  270 Madison Ave                      450 Lexington Ave
  New York, NY 10016                   New York, NY 10017


*Lead Counsel for Consolidated*          *Counsel for Defendants Credit Suisse*
*Plaintiffs Elite Aviation LLC,*          *AG, Credit Suisse Securities (USA)*
*Endless H3, David Schottenstein,*        *LLC, Brady W. Dougan, Renato*
*William Bostedo, Grace Trading*          *Fassbind, D. Neil Radey, Walter B.*
*LLC, Ann Nicolosi, Mountain Vista*       *Kielholz, Hans-Ulrich Doerig, Peter*
*LLC, Ram Sinai, DRHP, Inc., Md.*         *Brabeck-Letmathe, Thomas W.*
*Mostofa Afzal Momen, Rick L.*            *Bechtler, Robert H. Benmosche, Noreen*
*Colyer, Yohanna Marini, Jorge*           *Doyle, Jean Lanier, Anton Van Rossum,*
*Bitar Naim, Elias Antonio Khouri*        *Aziz R. D. Syriani, David W. Syz, Ernst*
*Makl, William Mathers, Brian*            *Tanner, Richard E. Thornburgh and*
*Vandiver, Farid Rahimi and*              *Peter F. Weibel*
*Robert Kovaks*

LAURA TAYLOR SWAIN, UNITED STATES DISTRICT JUDGE

This consolidated case is a putative class action brought on behalf of investors who purchased Velocity Shares Daily 2x VIX Short Term Exchange Traded Notes[1] ("TVIX ETNs") between November 30, 2010, the date on which the TVIX ETNs were first offered, and the date of the Complaint in this action (the "Class Plaintiffs"), with certain claims brought only on behalf of a subclass consisting of investors who purchased TVIX ETNs between February 22, 2012, and March 22, 2012, while there was a temporary suspension of the issuance of TVIX ETNs (the "Dislocation Subclass Plaintiffs" and, together with the Class Plaintiffs, "Plaintiffs"). Plaintiffs allege that they invested in the TVIX ETNs pursuant to a March 25, 2009, Registration Statement and Prospectus (the "Registration Statement") and a series of pricing supplements (one of which is attached as Exhibit 1 to Defendants' Declaration in support of their motion and is referred to herein as the "Pricing Supplement" and, together with the Registration Statement, the "Offering Documents"). The Dislocation Subclass Plaintiffs also allegedly relied on the press releases issued by Credit Suisse on February 21, 2012 and March 22, 2012, respectively (the "Press Releases"). (CCAC ¶ 2.) Plaintiffs assert claims under Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 17k and 77o.

Defendants Credit Suisse, AG, Credit Suisse Securities (USA), LLC (collectively,

---

[1]    Unlike exchange-traded funds, which buy and own their underlying investments, an ETN is an "unsecured debt obligatio[n], which do[es] not actually buy or sell assets to replicate an underlying index," issued by an underwriting bank. (Consolidated Class Action Amended Complaint ("CCAC") ¶ 48.) ETNs have a maturity date and are backed only by the credit of the issuer. The issuer promises to pay the holder of the ETN an amount determined by reference to the performance of a specific index or other benchmark of the ETNs on a maturity date 10, 30, or sometimes 40 years from issuance. (Id.) ETNs trade on exchanges throughout the day at prices determined by the market, based on "indicative" values calculated by reference to the relevant indexes or other benchmarks. The issuers of ETNs are not required to own the exact baskets of futures to which the ETNs are linked and, instead, maintain a net risk position that they manage as part of a bigger volatility portfolio. (Id. ¶ 50.)

SPA-3

"Credit Suisse")[2] and the individual defendants (who are directors and officers of Credit Suisse) (together with Credit Suisse, the "Defendants")[3] move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all of the claims asserted in the Consolidated Class Action Complaint (the "CCAC"). The Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act, 15 U.S.C. § 77v. Having considered carefully the parties' submissions and arguments, the Court grants Defendants' motion in its entirety.

BACKGROUND

The following facts are alleged in the CCAC or drawn from the Offering Documents and Press Releases. TVIX ETNs are one of the six types of ETNs that Credit Suisse offers to investors who seek exposure to the volatility of equities in the S&P 500 Index. (CCAC ¶ 51.) The "VIX" is a trademarked ticker symbol for the Chicago Board Options Exchange ("CBOE") Market Volatility Index, which measures the implied 30-day volatility of S&P 500 Index options. (Id. ¶¶ 51, 54-56.) The VIX is quoted in percentage points and roughly corresponds to the expected movement of the S&P 500 Index over the upcoming 30-day period, which is then annualized, allowing investors the ability to invest in changes in forward volatility based on their views of the future direction of the market. (Id. ¶¶ 54-56.) The specific ETN at issue here, the TVIX ETN, uses a formula to track the performance of the S&P 500 VIX Short-Term Futures

---

[2]     Defendant Credit Suisse AG is the issuer and Defendant Credit Suisse Securities (USA) LLC is the underwriter of the TVIX ETNs.

[3]     The individual defendants are Brady W. Dougan, Renato Fassbind, D. Neil Radey, Walter B. Kielhoz, Hans-Ulrich Doerig, Peter Brabeck-Letmathe, Thomas W. Bechtler, Robert H. Benmosche, Noreen Doyle, Jean Lanier, Anton Van Rossum, Aziz R.D. Syriani, David W. Syz, Ernst Tanner, Richard E. Thornburgh and Peter F. Weibel.

Index (the "Index"), which, in turn, is based on the value of futures contracts on the VIX.  TVIX

ETNs are designed to offer a leveraged exposure to the VIX (specifically, two times the daily

performance of the Index) (Id. ¶¶ 56-65.)  Applying this formula results in an Indicative Value for

the TVIX ETNs, which changes throughout the day based on changes in the value of the Index.

TVIX ETNs must be rebalanced every day in order to track the Index and to achieve

their daily investment objectives.  Plaintiffs allege that the mechanics of the daily rebalancing

caused the TVIX ETNs to underperform their target returns when held for longer than a single

trading session.  (Id. ¶ 63.)  Plaintiffs assert that the Offering Documents misled investors as to the

propriety of holding TVIX ETNs for longer than a single trading session because, inter alia, the

"Offering [D]ocuments did not disclose the mechanics of daily rebalancing or how daily

rebalancing would constantly disadvantage the portfolio, leading to lower daily closing indicative

values . . . and lower market prices for TVIX ETNs" over time.  (Id.)[4]  Plaintiffs also allege that in

2012, which was a volatile time in the financial markets, investors and speculators sought exposure

to VIX-related products in order to hedge volatility risk and the volume of TVIX ETNs soared.

(Id. ¶¶ 69-70.)

On February 21, 2012, Credit Suisse announced, through a press release that was

filed with the SEC, that it had temporarily suspended further issuances of the TVIX ETNs because

it had reached "internal limits."  (Id. ¶ 72; ("Feb. 21 Press Release").)  The Feb. 21 Press Release

warned that "the market value of the ETNs may be influenced by, among other things, the levels of

---

[4]   TVIX ETNs have a formula-based Indicative Value, but trade at market prices, which
fluctuate as investors buy and sell TVIX ETNs in the secondary market.  Normally,
the market price is close to the Indicative Value because of arbitrage opportunities
between the two values (i.e., if the market price is above the Indicative Value,
investors can buy new TVIX ETNs at the Indicative Value and sell them in the market
at a higher price and vice versa).

supply and demand for the ETNs" and warned investors "that the temporary suspension of further

issuances may cause an imbalance of supply and demand in the secondary market for the ETNs,

which may cause the ETNs to trade at a premium or discount in relation to their indicative value"

and that "any purchase of the ETNs in the secondary market may be at a purchase price

significantly different from their indicative value."  (Id.)  Following this suspension, TVIX ETNs

began trading at prices that did not correspond to the Index that they were designed to track and, by

March 21, 2012, TVIX ETNs were trading at a 90% premium to their Indicative Value.  (Id. ¶ 73.)

At the close of trading on March 22, 2012, Credit Suisse announced, again through a press release

filed with the SEC, that it would reopen the issuance of TVIX shares on a limited basis the next

day.  The market price of TVIX ETNs dropped rapidly and significantly beginning that afternoon.

(Id. ¶¶ 74-76.)

       Plaintiffs allege that, throughout the Class Period, the Offering Documents

misstated and omitted material facts and information concerning the substantial risk associated

with purchasing TVIX ETNs and the magnitude of that risk, including: (1) statements and other

indicators suggesting that a holding period longer than one trading session was appropriate; (2) a

series of "Hypothetical Examples" (projecting performance over a 20 year period) that

misleadingly implied that TVIX ETNs could or should be held for longer than a single trading

session and could or would deliver targeted returns over such a longer period, and omitted material

information about the substantial risks that would adversely affect holders of notes over longer

trading periods; and (3) "omitted material information concerning the quantifiable risk that the

daily rebalancing of TVIX ETNs would cause the notes to underperform their targeted returns by

an average of 24 basis points each day or 48.6% per annum."  (Id. ¶¶ 6, 85, 91, 105-07.)

       With respect to the Dislocation Subclass, Plaintiffs allege that the Offering

Documents, inter alia, (1) misstated that Credit Suisse would issue more TVIX ETNs in order to meet any growth in the demand for them (id. ¶ 7), (2) omitted material information concerning whether there was a limit on the number of TVIX ETNs that Credit Suisse could or would issue or that Credit Suisse could or would cease issuing the notes (id. ¶¶ 7, 138), (3) omitted material information concerning whether Credit Suisse maintained internal limits on the number of TVIX ETNs it could or would offer for sale, (4) omitted material information concerning the nature and magnitude of the substantial risk that TVIX ETNs would become illiquid during that period (id. ¶¶ 7, 147), (5) omitted material information concerning the likelihood and the reasons why TVIX ETNs could deviate from their intrinsic value, including the impact of a decision to cease issuing TVIX ETNs (id. ¶¶ 143-57), and (6) omitted material information disclosing that the "vertical platform" employed by Credit Suisse to sell and manage TVIX ETNs (i.e., the use of affiliated companies to perform various functions relating to ETN issuance and the hedging of risks relating to the TVIX ETNs) was inherently more risky than traditional "open" platforms involving non-affiliated entities and made it more difficult for Credit Suisse to hedge its exposure to the notes (id. ¶¶ 7, 140.)

<u>DISCUSSION</u>

When deciding a motion, pursuant to Rule 12(b)(6), to dismiss a complaint the Court accepts the allegations in the complaint as true and draws all reasonable inferences in the plaintiffs' favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court should not dismiss a complaint if plaintiffs have alleged "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). It is

not enough for a plaintiff to plead facts that are "merely consistent with" a right to relief.  Id. at

557.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft

v. Iqbal, 556 U.S. 662, 678 (2009).

Plaintiffs assert claims under Section 11 of the Securities Act, which "prohibits

materially misleading statements or omissions in registration statements filed with the SEC."  In re

Morgan Stanley Info. Fund Secs. Litig., 592 F.3d 347, 358 (2d Cir. 2010); see 15 U.S.C. §77(k).

Plaintiffs also assert "control person" liability claims under section 15 of the Securities Act, based

on the alleged violations of Section 11.  Where, as here, the Section 11 claims sound in negligence

rather than in fraud, Plaintiffs' pleading must satisfy the basic requirements of Rule 8(a)(2) of the

Federal Rules of Civil Procedure, rather than the heightened standard set by Rule 9(b).

"Therefore, notice pleading supported by facially plausible factual allegations is all that is required

– nothing more, nothing less."  In re Morgan Stanley Info. Fund, 592 F.3d at 358.

When evaluating a Rule 12(b)(6) motion to dismiss, the Court may consider

documents that are referenced in the complaint, documents that plaintiffs relied on in bringing suit

and that are either in the plaintiff's possession or the plaintiff knew of when bringing suit, and

matters of which judicial notice may be taken.  See Chambers v. Time Warner Inc., 282 F.3d 147,

153 (2d. Cir. 2002).  On a motion to dismiss, the court may take judicial notice of offering

documents filed with the Securities and Exchange Commission.  ATSI Commc'ns, Inc. v. Shaar

Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).  The Court has therefore considered the Offering

Documents, as well as the Press Releases, in evaluating the sufficiency of the allegations in the

CCAC.

<u>Alleged Misstatements[5] or Omissions by Defendants</u>

To state a viable Section 11 claim, the plaintiff must allege facts demonstrating plausibly that: "(1) she purchased a registered security, either directly from the issuer or in the aftermarket following the offering; (2) the defendant[s] participated in the offering in a manner sufficient to give rise to liability under section 11; and (3) the registration statement 'contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'"  <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d at 358-59 (quoting 15 U.S.C. § 77k(a)).

To determine the materiality of a misstatement or omission, the Court must consider "[w]hether the defendants' representations, taken together and in context, would have misled a reasonable investor."  <u>In re Morgan Stanley Info. Fund</u>, 592 F.3d at 360 (quoting <u>Rombach v. Chang</u>, 355 F.3d 164, 172, n. 7 (2d Cir. 2004)).  "In judging whether an alleged omission was material in light of the information already disclosed to investors, we consider whether there is a <u>substantial</u> likelihood that the disclosure of the omitted material would have been viewed by the <u>reasonable</u> investor as having <u>significantly</u> altered the total mix of information already made available."  <u>In re ProShares Trust Secs. Litig.</u>, 728 F.3d 96, 102 (2d Cir. 2013) (citations and internal punctuation omitted and emphasis in original).  "It is not sufficient to allege that the investor might have considered the misrepresentation or omission important."  <u>Id.</u> (internal quotation marks and citation omitted).  "[P]laintiffs are not allowed to plead Section 11 claims with the benefit of 20/20 hindsight" because "Section 11 claim[s] cannot be based on a 'backward-looking assessment' of the registration statement."  <u>Charter Twp. of Clinton Police &</u>

---

[5]     Although Plaintiffs assert in the CCAC that Defendants' actionable conduct involved both misstatements and omissions, their factual allegations focus principally on alleged omissions, as will the Court's analysis of their claims.

Fire Ret. Sys. v. KKR Fin. Holdings LLP, No. 08 Civ. 7062(PAC), 2010 WL 4642554, at * 11

(S.D.N.Y. Nov. 17, 2010) (citation omitted).


          Class Plaintiffs' Claim that the Offering Documents Misled Plaintiffs as to the
          Appropriate Holding Periods for the TVIX ETNs

          The Class Plaintiffs allege that the Offering Documents "misleadingly implied that

TVIX ETNs could or should be held for longer than a single trading session" and "omitted material

information about . . . the substantial risks that would adversely affect holders of the notes over

longer holding periods . . ." (CCAC ¶ 6.)  The Class Plaintiffs further allege that the Offering

Documents "omitted material information concerning the quantifiable risk that daily rebalancing of

TVIX ETNs would cause the notes to underperform their targeted returns by an average of 24

points each day or 48.6% per annum."  (Id.)  The Class Plaintiffs' first set of allegations – that the

Offering Documents did not clearly warn investors not to hold the TVIX ETNs for longer than a

single trading session and omitted information about the substantial risks that would adversely

affect note holders over longer holding periods – are rendered untenable by the more than 25 plain

English warnings concerning the risks of prolonged investments that are provided throughout the

Pricing Supplement.

          The Pricing Supplement ("PS") states, inter alia, that: TVIX ETNs were designed to

achieve their investment objective on a daily basis (PS at cover page); that a TVIX ETN's

performance can "differ significantly" from its stated objective if held for longer than one day (id.

at cover page, 1, 8 and 9); that TVIX ETNs are not suitable for investors who intend to hold the

notes for longer than one day and investors should monitor their investments even intra-day (id. at

cover page);[6] that the relationship between the notes' Indicative Value and the Index will begin to break down over holding periods longer than one day (id. 27-28); that the long-term expected value of a TVIX ETN is zero (id. at cover page); and that the TVIX ETN financial product is intended to be used only by sophisticated investors to manage risk (id. 9).  These same warnings are repeated under the heading, "Long Holding Period Risk" (id. 8); under the heading, "Is this the right investment for you?" (id. 9-10); and in the thirteen-page "Risk Factors" section of the Pricing Supplement (id. 26-38).  The Offering Documents thus explicitly warned Class Members that the TVIX ETNs were complex, volatile financial products designed for sophisticated investors' use in daily hedging, and that significant losses would likely attend longer-term holding strategies. Similar disclosures were held sufficient to apprise a reasonably prudent investor that "the [financial products] could not meet their goal for any period longer than one day and might in fact produce very different results if held for a longer period" in In re ProShares, 889 F. Supp. 2d 644, 654 (S.D.N.Y. 2012), aff'd, 728 F.3d 96 (2d Cir. 2013).

      Plaintiffs nonetheless contend that the Offering Documents should have spelled out and quantified particular risks associated with the mechanics of daily rebalancing, which "virtually ensured that the TVIX ETNs would underperform their expected returns each trading day."  (Pl. Opp. at 20.)  According to the Plaintiffs, the TVIX ETNs lost a small but unavoidable percentage of their returns each day, which made it impossible for them to achieve their expected returns over any period longer than a single trading session.  (CCAC ¶¶ 80, 85.)  Plaintiffs allege that, within two

---

[6]    When describing the type of investor who should invest in TVIX ETNs, the Pricing Supplement states that the TVIX ETNs were not designed for investors who "seek a long-term investment objective;" "seek current income from your investment;" "are not . . . sophisticated investor[s] and [who] seek an investment for other purposes than managing daily risk;" and "seek an investment with a longer duration than a daily basis."  (PS 9-10.)

years, the TVIX ETNs would have become virtually worthless due to the cumulative decay, and assert that the Offering Documents should have included a projection to that effect.  (Id. ¶¶ 80-87.) Plaintiffs also fault Defendants' failure to state that the mathematical formula used by the Defendants "to achieve the TVIX ETNs' daily investment targets clearly showed that the leveraged results would correlate with market volatility and the length of the holding period, not the direction in which the Index moved over time."  (Pl. Opp. at 21.)  According to the Plaintiffs, the statement in the Offering Documents that "[d]aily rebalancing will impair the performance of each ETN if the underlying Index experiences volatility" was insufficient to cover the virtual certainty and magnitude of the daily decay of the notes.  (CCAC ¶ 78.)

The Pricing Supplement, however, explained that TVIX ETNs rebalanced their theoretical exposure on a daily basis in order to provide a return which was related to the daily performance of their Index.  (PS 38.)  To clarify how rebalancing worked, the Pricing Supplement also included mathematical examples demonstrating for investors how rebalancing would magnify losses and erode gains.  (See, e.g. Id. 28-29.)  Moreover, the Pricing Supplement states that "[a]t higher ranges of volatility, there is a significant chance of a complete loss of the value of the ETNs even if the performance of the applicable underlying Index is flat" and that "[t]he ETNs are designed as short-term trading vehicles for investors managing their portfolios on a daily basis" and "are not intended to be used by, and are not appropriate for investors who intend to hold positions in an attempt to generate returns over longer periods of time."  (Id. 38)  The erosion of the TVIX ETNs' value over longer periods of time was emphasized throughout the Pricing Supplement.  (See, e.g., PS at cover page, PS 1, 8-9, 38.)  The fact that the TVIX ETNs' value was likely to erode was thus made obvious to a reasonable investor.

The Class Plaintiffs' contentions that Defendants knew at the time of their issuance

SPA-12

that TVIX ETNs would become worthless in two years and that this knowledge should have been disclosed to investors are similarly unavailing. This argument appears to be based on a retrospective analysis of the historical data, as Plaintiffs assert in the Complaint that "given the level of volatility in the VIX at the time, loss would average approximately 24 basis points or (.24%) each and every day." (CCAC ¶ 85.) As the district court observed in In re ProShares, 899 F. Supp. 2d at 656, "[w]hatever formula was used [in developing the figures plaintiffs claimed should have been included in the earlier disclosure]. . ., it would necessarily rely on inputs from the underlying index or benchmark, and those inputs could not be known in advance. It is not a material omission to fail to predict future market performance." See also Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008) ("securities laws do not require clairvoyance in the preparation of offering documents"). Nor did Defendants have a duty to include forecasts "based on a range of historical VIX volatility." (Pl. Opp. at 23, n. 21.) Since historical volatility data or the volatility trends are publicly available, their disclosure is not required. See, e.g., In re Merrill Lynch & Co., Research Reports Sec. Litig., 272 F. Supp. 2d 243, 249-50 (S.D.N.Y. 2003) ("Sections 11 and 12(a)(2) do not require the disclosure of publicly available information").

The disclosure documents at issue in Rafton v. Rydex Series Funds, No. 10 Civ. 01171(LHK), 2011 WL 31114, at *5 (N.D.Cal. Jan. 5, 2011), on which Plaintiffs rely heavily for their argument that pointing to omissions of detailed information is sufficient to state plausibly their Section 11 claim, involved a different overall mix of information. There, the disclosure documents were, inter alia, equivocal about the effects of market volatility and longer term holdings. Here, the Pricing Supplement stated clearly that daily rebalancing would impair performance if there was any volatility. In the context of an instrument tied to an index of volatility, this disclosure was

SPA-13

sufficient, without detailed computations, to disclose the fundamental risk associated with volatility and daily rebalancing.  Cf. In re ProShares, 728 F.3d at 102 ("In the words of the district court below, '[w]hen a registration statement warns of the exact risk that later materialized, a [s]ection 11 claim will not lie as a matter of law.'") (citation omitted)).

The Pricing Supplement underscored repeatedly that the TVIX ETNs were intended to be used "as short-term trading vehicles for investors managing their portfolios on a daily basis." (PS 38.)  Investors were further warned that "[t]he ETNs are riskier than securities that have intermediate or long-term investment objectives, and may not be suitable for investors who plan to hold them for longer than one day" (id. at cover page) and that "[t]he relationship between the level of the VIX Index and the underlying futures on the VIX Index will begin to break down as the length of an investor's holding period increases, even within the course of a single Index Business Day" (id. 27).  Because the Offering Documents, read as a whole and in context, disclosed the fundamental risks associated with daily rebalancing and informed the reasonable investor that the TVIX ETNs were not suitable for longer-term investment strategies and unsophisticated investors, Plaintiffs' allegations that further details and computations should have been included are insufficient to state plausibly their Section 11 claim that material information necessary to make the disclosures not misleading was omitted.

Plaintiffs fare no better in their effort to establish a Section 11 violation by alleging that information that accompanied Defendants' warnings and risk disclosures so undermined that language as to mislead a reasonable investor.  Plaintiffs cite In re Direxion Shares ETF Trust, 279 F.R.D. 221 (S.D.N.Y. 2012), a decision in which plaintiffs were held to have stated a Section 11 claim for misrepresentations or omissions by focusing on language proximate to risk warnings that arguably undermined the import of the disclosure.  Such "contra-indicators," according to the

SPA-14

Direxion Shares Court, were sufficient to state a claim that the disclosures did not reveal sufficiently "the magnitude of the risk."  Id. at 232.  Here, Plaintiffs argue that, although there were references to the "daily" nature of proper TVIX ETN investments in the Offering Documents, the Offering Documents were also "replete with contra-indicators" which misled the Plaintiffs into believing that holding the TVIX ETNs for longer than one day was appropriate.

Plaintiffs point to three alleged contra-indicators in the Offering Documents: (1) references to a cash pay-out at maturity, which allegedly indicated that TVIX ETNs could properly be held until maturity; (2) four pages of "Hypothetical Examples" which allegedly misled investors as to how long it was appropriate to hold the TVIX ETNs; and (3) warnings in the Offering Documents that also allegedly implied that holding TVIX ETNs for longer than one day was appropriate.  (Pl. Opp. at 15.)

The Court's consideration of Plaintiffs' "contra-indicator" arguments begins with a return to first principles – the question at issue is whether the Offering Documents were rendered misleading by material omissions.  As explained above, "[i]n judging whether an alleged omission was material in light of the information already disclosed to investors, we consider whether there is a substantial likelihood that the disclosure of the omitted material would have been viewed by the reasonable investor as having significantly altered the total mix of information already made available."  In re ProShares, 728 F.3d at 102 (citations and internal punctuation omitted).  To the extent that Plaintiffs' contra-indicator approach relies on reading individual words and phrases against each other in isolation, its consistency with these principles is questionable.  The Court has, however, reviewed both the juxtaposition of the particular elements identified by Plaintiffs and the overall mix of information provided and, as explained below, concludes that Plaintiffs have not pleaded plausibly that a reasonable investor could have read the Offering Documents without

understanding that the daily balancing and leveraging features of the TVIX ETNs exposed investors

to the risk of significant losses if they held the securities for more than a day.

The first alleged contra-indicators that Plaintiffs cite are statements in the Offering

Documents that describe holding the TVIX ETNs to maturity.  (CCAC ¶¶ 65, 105-06.)  For

example, Plaintiffs allege that the Pricing Supplement states that "investors will receive a cash

payment at maturity, upon early redemption or upon acceleration by us that will be linked to the

performance of the applicable underlying Index, plus a Daily Accrual and less a Daily Investor

Fee."  (Id. ¶ 66.)  This statement simply identifies the three circumstances under which TVIX ETN

holders receive cash payments from Credit Suisse and does not suggest that investors hold the

TVIX ETNs to maturity.  Moreover, when read in the context of the numerous adverse long-term

investment disclosures in the Pricing Supplement, the Class Plaintiffs could not have reasonably

concluded that the TVIX ETNs could appropriately be held until maturity.  As Plaintiffs concede,

the Pricing Supplement warned that TVIX does not "guarantee any return of principal at maturity."

(CCAC ¶ 105(a); Pl. Opp. at 14, n. 10.)  The Pricing Supplement stated multiple times that "**[t]he

ETNs do not pay interest nor guarantee any return of principal and you may lose all or a

significant part of your investment in the ETNs**" (see, e.g., PS 26 (emphasis in original)) and that

"**[i]n almost any potential scenario, the closing Indicative Value . . . of your ETNs is likely to

be close to zero after 20 years and we do not intend or expect any investor to hold the ETNs

from inception to maturity**" (id. at cover page (emphasis in original)).  Plaintiffs were further

warned that "**[t]he long term expected value of your ETNs is zero**." (PS 28 (emphasis in

original).)

Disclosures relating to "provisions with respect to maturity" are required to be

included in Item 202(b)(1) of Regulation S-K for a registered debt security, like TVIX ETNs, see

17 C.F.R. § 229.202(b)(1) and, as they were presented here in a neutral manner, limited references to pay-outs at maturity, in a document that repeatedly emphasized the daily investment strategy and the risks of longer term holdings, would not have led a reasonable investor to believe that the TVIX ETNs should be held until maturity.  See In re Nokia OYJ, 423 F. Supp. 2d 364, 393, 397 (S.D.N.Y. 2006) (investors must consider the "total mix" of information available) (internal quotation marks and citation omitted); DeMaria v. Andersen, 318 F.3d 170, 182 (2d Cir. 2003) (Section 11 claims must be dismissed if the court finds that the offering materials "taken together would not have misled a reasonable investor").

Plaintiffs also allege that the hypothetical examples included in the Pricing Supplements served as contra-indicators and misled investors by purporting to "illustrat[e] the effect that different factors may have on the Maturity Redemption Amount" of the TVIX ETNs and to "illustrat[e] a few of the potential possible Closing Indicative Values for the ETNs" while offering hypothetical examples of returns after 20 years.  (CCAC ¶¶ 88, 92.)  Plaintiffs emphasize that three of the four hypothetical closing Indicative Values for the year 2030, included as examples in the Pricing Supplement, were not zero, and that at least one scenario hypothesized a significant positive rate or return.  (Id., Pl. Opp. at 15.)  However, the hypothetical examples were accompanied by explicit statements that they were intended merely to illustrate the effect of various factors on the value of the ETNs and should not be taken as a prediction of results because each example was "a random possibility generated by a computer among an infinite number of possible outcomes . . . [y]our return may be materially worse," and "[t]he actual performance of the Indices . . . may bear little relation to the hypothetical return examples."  (PS 12-13.)  Moreover, the paragraphs introducing the examples, which Plaintiffs contend led them to believe that the ETNs could be held for longer periods of time, stated that "[t]he hypothetical examples highlight the

negative impact of higher annualized volatility" and that "in almost any potential scenario the

Closing Indicative Value of your ETNs is likely to be close to zero after 20 years and we do not

intend or expect any investor to hold the ETNs from inception to maturity." (Id.)  Accordingly, as

in In re ProShares, the hypothetical examples do not "specifically contemplate[ ] an investment

strategy of holding for longer than one day," see In re ProShares, 889 F. Supp. 2d at 654.

Furthermore, "[i]n determining whether the statements contained in the [Offering Documents] are

materially misleading, the [Offering Documents] must be read as a whole."  In re AMF Bowling

Secs. Litig., No. 99 Civ. 3023(DC), 2001 WL 286758, at *4 (S.D.N.Y. Mar. 23, 2001) (citations

omitted).  "'[T]he central issue . . . is not whether the particular statements, taken separately, were

literally true, but whether defendants' representations, taken together and in context, would have

mis[led] a reasonable investor about the nature of the [securities].'"  Id.  (citations omitted).  In light

of the extensive disclosures in the Offering Documents, a reasonable investor could not have

concluded that holding TVIX ETNs for any period was appropriate or recommended.

         Plaintiffs further contend that even the warnings in the Offering Documents implied

that holding the TVIX ETNs for longer than one day was appropriate, because those warnings

stated that the performance of the TVIX ETNs would depend, in part, on "the path of the daily

returns during the holder's holding period."  (CCAC ¶ 78.)  The paragraph of the Pricing

Supplement in which this phrase appears reads as follows:

> Daily rebalancing will impair the performance
> of each ETN if the underlying Index
> experiences volatility and such performance
> will be dependent on the path of daily returns
> during the holder's holding period.  At higher
> ranges of volatility, there is a significant
> chance of a complete loss of value of the ETNs
> even if the performance of the applicable
> underlying Index is flat.  The ETNS are
> designed as short-term trading vehicles for

> investors managing their portfolios on a daily
> basis.  They are not intended to be used by, and
> are not appropriate for, investors who intend to
> hold positions in an attempt to generate returns
> over longer periods of time.

(PS 38.)  Offering materials must be read as a whole and the challenged statements must be put in

the context of any surrounding cautionary language.  Schoenhaut v. Ams. Sensors Inc., 986 F.

Supp. 785, 793 (S.D.N.Y. 1997).  The above-cited paragraph explains how volatility in the markets

will impair the TVIX ETNs' performance for holding periods longer than one day.  The phrase

focused upon by the Plaintiffs, when read in context, does not undermine the other disclosures

regarding the daily nature of the TVIX ETNs as an investment vehicle.  Indeed, it appears

immediately after a short paragraph that includes the statements: "The ETNs do not attempt to, and

should not be expected to, provide returns which achieve the inverse or a 2X leveraged return of the

Index for periods other than a single day.  Each of the inverse ETNs and 2X Long ETNs rebalances

its theoretical exposure on a daily basis, increasing exposure in response to that day's gains or

reducing exposure in response to that day's losses."  (PS 38.)  Plaintiffs, accordingly, have not

pleaded plausibly that a reasonable investor would have been misled as to the appropriate holding

period by the reference to "the path of the daily returns . . . during the holder's holding period" in

the quoted paragraph of the Pricing Supplement.  (CCAC ¶ 78.)

  Neither Plaintiffs' identified "contra-indicators" nor the text of the Offering

Documents read in context and as a whole could have lead a reasonable investor to conclude that

holding TVIX ETNs on a longer than daily basis was an appropriate investment strategy, much less

one that could conceivably be profitable.  Plaintiffs have thus failed to plead plausibly that the

disclosure provided was misleading, or that omissions of additional computations or other

particularized disclosures illustrating the risks were material.  The Section 11 claims asserted on

behalf of the Class Plaintiffs will therefore be dismissed.

Dislocation Subclass Claims

On February 21, 2012, Credit Suisse issued a press release announcing a temporary suspension of new issuances of TVIX and, on March 22, 2012, it announced the reopening of new issuances of TVIX.  (CCAC ¶¶ 110-29.)  In the period during which new issuances were suspended, the TVIX ETNs traded in the secondary market at a premium over their Indicative Value; their market price dropped significantly when Credit Suisse began re-issuing TVIX ETNs. The Dislocation Subclass Plaintiffs claim that Defendants misled them by stating in the Offering Documents that Credit Suisse would issue more TVIX ETNs in order to meet any growth in demand for them and omitted material information concerning: (1) the existence of any limit on the number of TVIX ETNs that Credit Suisse would issue, whether Credit Suisse could or would cease such issuances and the circumstances under which any cessation would occur; (2) whether Credit Suisse maintained internal limits on the number of TVIX ETNs that it would issue and the relationship of the number of outstanding notes to any such limits; (3) the nature and magnitude of illiquidity risks associated with a cessation of TVIX issuances; (4) the likely effect of the suspension on TVIX ETN investor short selling behavior and consequent relationship between TVIX ETN market prices and Credit Suisse's exercise of discretion to issue new ETNs; and (5) whether the internal securities issuance and hedging structure that Plaintiffs refer to as Credit Suisse's "vertical platform" was riskier than other multi-party structures and made it more likely that Credit Suisse would cease or suspend note issuances.  (CCAC ¶ 7.)

*Alleged Misstatement*

Plaintiffs allege that Defendants "misstated that Credit Suisse would issue more TVIX ETNs in order to meet any growth in the demand for the notes." (CCAC ¶ 7(a).) They cite no specific provision of the Offering Documents for this proposition. Their allegation is belied by the plain text of the Offering Documents, which made it clear that Credit Suisse <u>could</u> issue additional notes but made no undertaking that Credit Suisse would always issue additional notes in response to demand. On the first page of its "Summary" section, the Pricing Supplement states: "[w]e may, without providing you notice or obtaining your consent, create and issue ETNs of each series in addition to those offered by this pricing supplement having the same terms and conditions as the ETNs of such series." (<u>See</u>, <u>e.g.</u>, PS 1, 55.) The Pricing Supplement specifically warned investors that Credit Suisse was "under no obligations [sic] to issue additional ETNs to increase the supply," and that,"[i]n our sole discretion, we may decide to sell additional ETNs subsequent to the Trade Date. " (PS 33-44.)

*Alleged Omissions*

As demonstrated in the preceding paragraph, the Offering Documents clearly disclosed that Credit Suisse had discretion to issue further TVIX ETNs or refrain from doing so. The risk of that suspension was thus made plain, and no reasonable investor could have read the Offering Documents as a guarantee against suspension of issuances. Plaintiffs complain that Credit Suisse did not disclose details of the circumstances under which issuances might be suspended, or the likelihood of such suspension. While it is true that Credit Suisse made no such advance disclosure, Plaintiffs have failed to plead plausibly that Credit Suisse had a duty to make such disclosure or that such disclosure was material. The fundamental risk – that of a suspension or

SPA-21

cessation – was disclosed in connection with the offering of these securities as a daily investment vehicle. That such issuance was discretionary and could be suspended was further underscored by the February 21 Press Release, which also disclosed internal limits as a possible and actual trigger for suspension. Any Subclass member buying after that date thus had clear notice that sales could and would be suspended, as well as knowledge that Credit Suisse retained discretion to issue more ETNs at any time. That Press Release also disclosed that the suspension could lead to divergence of market prices from Indicative Values.

As a matter of law, the reason why the new issuances were suspended was immaterial once the possibility of suspension and the risks flowing from suspension were fully disclosed to the Plaintiffs. Defendants are not required to "predict the precise manner in which risks will manifest themselves." In re AES Corp. Sec. Litig., 825 F. Supp. 578, 588 (S.D.N.Y. 1993). Plaintiffs thus fail plausibly to plead any actionable omission with respect to disclosure of the nature and circumstances of suspension and new issuances as risk factors.

The Dislocation Subclass Plaintiffs' allegations that the risks faced by investors if new issuances were suspended and material information concerning why the TVIX ETNs could deviate from their intrinsic value were not adequately disclosed are thus belied by the Offering Documents and the Press Releases. Indeed, the Pricing Supplement warned that numerous factors "will influence the market value of your ETNs" and that "[y]ou may . . . sustain a significant loss if you sell your ETNs in the secondary market." (PS 33.) The disclosed factors which would affect market price, listed in the Pricing Supplement, included the "[s]upply and demand for ETNs in the secondary market . . . [which] will be affected by the total issuance of the ETNs;" the Pricing Supplement further cautioned investors that "we are under no obligations [sic] to issue additional ETNs to increase the supply. " (Id.) The Pricing Supplement also warned that "any purchase of

ETNs in the secondary market may be at a purchase price significantly different from their indicative value." (Id.) Numerous risks relating to the secondary market for TVIX ETNs which might cause the market price to separate from the Indicative Value were also disclosed, including that Defendants were not obligated to create or maintain a secondary market for TVIX ETNs (id. 6, 33, see also, PS 35 ("[n]o assurance can be given as to . . . the liquidity or trading market for the offered ETNs). The February 21 Press Release also stated that "the suspension . . . may influence the market value of the ETNs . . . [and] Credit Suisse believes it is possible that the temporary suspension of further issuances may cause an imbalance of supply and demand in the secondary market for ETNs, which may cause the ETNs to trade at a premium or discount in relation to their indicative value." (Feb. 21, Press Release.) Therefore, whether the TVIX ETN's market price rose from a lack of new shares to support short selling and resulting illiquidity as opposed to an imbalance in supply and demand, the Pricing Supplement and February 21 Press Release had adequately disclosed to investors that a restriction in the supply of the TVIX ETNs would affect secondary market prices. Once Credit Suisse warned investors that the TVIX ETNs' price would be affected by changes in supply and demand, and further explained in the press release that the suspension of new issuances could result in a premium of market price over Indicative Value, it was not obligated to make a predication as to the probability that this would occur. See, e.g., Panther Partners Inc., 538 F. Supp. 2d at 664 ("the securities laws do not require clairvoyance in the preparation of offering documents").

Finally, the fundamental risks posed by Credit Suisse's so-called "vertical platform" were adequately disclosed to investors. The Pricing Supplement includes extensive disclosures on the roles of the various Credit Suisse entities in issuing, underwriting and hedging the TVIX ETNs and it explains in detail the risks to the TVIX ETN investors from Credit Suisse's

hedging activities and how those activities could affect both the Index and the Indicative Value of the TVIX ETNs.  (See, e.g., PS 10, 28-29, 33-34, 38, 52-53, 56.)  The fact that the "vertical platform" might have been a factor in Credit Suisse's decision to suspend new issuances is immaterial as a matter of law.  Credit Suisse did not have an obligation to predict exactly why it might decide to suspend the issuance of new TVIX ETNs.  See, e.g., Panther Partners Inc., 538 F. Supp. 2d at 664.  Because the fundamental risks associated with suspension and resumption of ETN issuances, and of hedging, supply and demand as integral factors in the relationship between indicative value and market value, and the likelihood of divergence between indicative and market values during the period of suspension were disclosed, Plaintiffs have failed plausibly to allege material omissions with respect to the Disclocation Subclass.  Accordingly, the claims asserted on behalf of the Subclass will be dismissed as well.

Because the Class Plaintiffs and Dislocation Subclass Plaintiffs have not plausibly pleaded claims under Section 11 of the Securities Act, the Court does not address Defendants' argument that Plaintiffs have not properly alleged loss causation.

Control Person Liability under Section 15

"Section 15 liability is derivative of liability under Sections 11 and 12."  In re Lehman Bros. Sec. & ERISA Litig., 903 F. Supp. 2d 152, 183 (S.D.N.Y. 2012).  The viability of Plaintiffs' Section 15 claim is thus dependent on the pleading of their underlying Section 11 claims.  Because they have failed plausibly to plead Section 11 claims, their complaint will be dismissed in its entirety.

SPA-24

<u>CONCLUSION</u>

For the foregoing reasons, Defendants' motion to dismiss the CCAC is granted in its entirety.  This Memorandum Order resolves docket entry number 33.  As this case is dismissed, the pending motion to intervene (docket entry no. 46) is hereby terminated.

The Clerk's Office is respectfully requested to enter judgment dismissing Plaintiffs' Consolidated Class Action Complaint and to close this case and cases 12 civ. 4756 and 12 Civ. 5475.

SO ORDERED.

Dated: New York, New York
       June 9, 2014

                                       /s/ Laura Taylor Swain
                                       LAURA TAYLOR SWAIN
                                       United States District Judge

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/10/2014
```

In re TVIX Securities Litigation
------------------------------------------------------------X

THIS DOCUMENT RELATES TO
ALL ACTIONS

12 **CIVIL** 4191 (LTS)

**JUDGMENT**

------------------------------------------------------------X

Defendants Credit Suisse, AG, Credit Suisse Securities (USA), Llc (Collectively, "Credit Suisse") and the individual defendants (who are directors and officers of credit Suisse) (together with Credit Suisse, the "Defendants") having moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss all of the claims asserted in the Consolidated Class Action Complaint )the "CCAC"), and the matter having come before the Honorable Laura T. Swain, United States District Judge, and the Court, on June 9, 2014, having rendered its Opinion and Order granting Defendants' motion to dismiss the CCAC in its entirety and directing the Clerk Office to enter judgment dismissing plaintiffs' Consolidated Class Action Complaint and to close this case and cases 12 Civ. 4756 and 12 Civ. 5475, it is,

**ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the Court's Opinion and Order dated June 9, 2014, Defendants' motion to dismiss the CCAC is granted in its entirety and the CCAC is dismissed; accordingly, these cases 12 Civ. 4191, 12 Civ 4756 and 12 Civ. 5475 are closed.

**Dated:** New York, New York
June 10, 2014

**RUBY J. KRAJICK**
**Clerk of Court**
**BY:**
**Deputy Clerk**

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____